# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-CA-01689-SCT

*UPCHURCH PLUMBING, INC. AND TRICONEX SYSTEMS, INC.*

*v.*

*GREENWOOD UTILITIES COMMISSION*

## ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 07/12/2005 |
| TRIAL JUDGE: | HON. W. ASHLEY HINES |
| COURT FROM WHICH APPEALED: | LEFLORE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | BRENDA B. BETHANY |
| | C. MICHAEL ELLINGBURG |
| ATTORNEYS FOR APPELLEE: | PHIL B. ABERNETHY |
| | THOMAS M. FLANAGAN, JR. |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 08/30/2007 |
| MOTION FOR REHEARING FILED: | 05/14/2007 |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.　The motion for rehearing is denied. The original opinion is withdrawn, and this opinion is substituted therefor.

¶2.　The Leflore County Circuit Court, after conducting a bench trial, entered judgment in favor of Greenwood Utilities Commission and against Upchurch Plumbing, Inc., and Triconex Systems, Inc., in the total amount of $2,622,451.96, plus post-judgment interest.

Upchurch Plumbing, Inc., and Triconex Systems, Inc., appeal the trial court's judgment. Finding no error, we affirm.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶3.     In May 1993, the Municipal Energy Agency of Mississippi (MEAM) contracted with General Electric Company (GE) for a major upgrade of three generating units at Greenwood, Yazoo City, and Clarksdale. With the written consent of GE, the Greenwood portion of that contract was fully assigned by MEAM to Greenwood Utilities Commission (Greenwood).[1] In January 1995, Greenwood contracted with Upchurch Plumbing, Inc., (Upchurch) for an upgrade of the control system for its General Electric Frame V combustion turbine. Upchurch subcontracted with Triconex Systems, Inc., (Triconex) for the hardware and installation of a digital control system for the turbine, in accordance with what is referred to by the parties as Contract 103.

¶4.     Marion Flanagan was Greenwood's manager of the turbine project, and Kimble Kelly was Greenwood's plant superintendent, with responsibility for daily operations at Greenwood. On November 10, 1995, Hamid Niakian, a control systems specialist for Triconex, went to Greenwood for on-site testing of the turbine. An attempt to start the turbine at the rated speed of 4,860 RPM ended when the mechanical overspeed bolt tripped and shut the turbine down at a speed reported as 4,000 RPM on the Triconex controls. Niakian asked that a Greenwood employee assist him with the testing of the turbine using

---

[1]Greenwood is an electric company owned and operated by the City of Greenwood, and Greenwood is a member of MEAM.

2

a Strobotac instrument[2] by pointing the Strobotac instrument at a designated place while Niakian viewed the digital RPM readout in the control room. Greenwood, without objection, provided Jerry Shaw, Greenwood's maintenance supervisor, who had never conducted that specific type of test using a Strobotac instrument. Shaw used a Strobotac instrument owned by Greenwood.

¶5.     Shaw placed the Strobotac instrument onto some portion of the turbine shaft and called out the speed readings into the control room area to Niakian, Bobby Bennett, a Greenwood electrical engineer, and Yu-Gene Chen, a GE engineer. The readings reported by Shaw confirmed the speed reported by the Triconex controls at each point, which led everyone involved to believe that the readings were correct. Thus, Lane Richard, a GE engineer in New Orleans, was contacted, and Richard directed Greenwood to adjust the overspeed trip bolt. Pursuant to Chen's instructions, Doug Elmore, a Greenwood employee, constructed a wrench and adjusted the mechanical overspeed bolt. The unit was started again, and when the unit reached normal operation speed, it experienced excessive vibration. Triconex was released from the job site pending resolution of the problem.

¶6.     On February 9, 1996, Dean Walters, a GE service engineer, tested the turbine speed using a digital tachometer. The turbine tachometer showed the turbine was actually operating at a speed of 6,560 RPM, while the new Triconex control system showed a speed of 4,860 RPM. GE instructed Greenwood not to operate the turbine any longer, because the

---

[2]A Strobotac instrument is an instrument for measuring the speed of a rotating object.

3

overspeed event had caused damage. Triconex's software for the control system contained a programming defect. Instead of using a 1:1 ratio between the turbine shaft and unit speed, the software used a 1:1.35 ratio, which corresponded to the auxiliary shaft rather than the turbine shaft. The result was an incorrect speed readout, which caused the turbine to run too fast during testing; as a result, the turbine rotor was damaged beyond repair and had to be replaced.

¶7. Greenwood originally filed suit against GE, Upchurch and Triconex in the Chancery Court of Leflore County on June 24, 1996. Greenwood's complaint requested that the chancery court grant, *inter alia*: (1) a declaratory judgment adjudicating which defendants were liable for the damage and repair to the unit; (2) an injunction mandating that the liable defendants repair the unit and specifically perform their contracts; (3) actual damages; (4) punitive damages; (5) prejudgment interest; (6) costs; (7) attorneys' fees; and (8) any other damages or relief as the court might find just. Subsequently, on September 17, 1996, GE filed its Motion to Transfer to Circuit Court, and Motion to Transfer Venue to Hinds County, pursuant to Miss. R. Civ. P. 12. GE argued that the chancery court did not have subject matter jurisdiction over a breach of contract claim where monetary damages, rather than an injunction, is the appropriate remedy. Additionally, GE argued that it could not get a fair trial in Leflore County because of press coverage concerning the incident with the unit.

¶8. On February 4, 1997, Chancellor Jon Barnwell entered an order finding that the chancery court did have subject matter jurisdiction and further ordered GE to investigate the damage to the unit, identify repairs necessary to correct the damage, and provide an estimate

4

of the cost of the necessary repairs. Chancellor Barnwell also ordered Greenwood, within ten days of receiving the quote from GE, to issue a purchase order to allow GE to proceed with the work pursuant to the quote, and directed Greenwood to pay GE for the completed repairs. On December 11, 1997, Chancellor Barnwell entered an agreed amended order by the parties allowing Greenwood to contract with GE for the actual repairs. On March 1, 2000, Chancellor Barnwell entered another order granting Defendant's Motion to Transfer to the Circuit Court of Leflore County.

¶9.    After years of discovery, this case eventually was scheduled to be conducted as a circuit court jury trial with Judge Ashley Hines presiding, on May 5, 2003, but it was rescheduled for September 8, 2003. However, on September 3, 2003, Judge Hines entered an Agreed Order Continuing Trial Setting and Resetting for Bench Trial. Judge Hines ultimately conducted a bench trial October 7-9, 2003, and issued his Findings of Fact and Conclusions of Law on October 18, 2004, which we quote verbatim:

1.    In the 1990s the Plaintiff, Greenwood Utilities Commission ("Greenwood Utilities"), began an upgrade project on its Frame V Gas Turbine ("the turbine") at its Henderson Generating Station.

2.    In order to upgrade the turbine, Greenwood Utilities entered into a contract with Upchurch Plumbing, Inc. ("Upchurch"). Pursuant to this contract Upchurch was to design and install a digital control system for the turbine. Upchurch then subcontracted with Triconex Systems, Inc. ("Triconex") for both the design and installation of the control system.

3.    Greenwood Utilities entered into a separate contract with General Electric Company ("GE") to produce the mechanical upgrade of the turbine and to complete its reinstallation at the Henderson Generating Station.

4.    The control system designed by Triconex was defective. The system required the input of data by which the controls determined the turbine shaft speed. Triconex chose to place the data sensors on an auxiliary

shaft without ascertaining the speed of the auxiliary shaft. Since the auxiliary shaft turned at a different speed than the turbine shaft speed the data sensors caused the control system to indicate a lower operating speed for the turbine than the actual operating speed.

5. The turbine featured an overspeed trip device which would stop the turbine if it exceeded a designated speed. During the installation and start up of the control system, the overspeed bolt tripped at the reported speed of 4,000 RPM. This was considerably below the designated trip speed of 5,346 RPM. Triconex engineer Hamid Niakian sought to confirm the actual turbine speed by independent testing. Greenwood Utilities employee Jerry Shaw assisted in this testing. Mr. Shaw entered the small confined area of the turbine with a strobotac instrument. Mr. Shaw, using the strobotac instrument, checked the speed of the turbine and called out the speed to Mr. Niakian who was in the control room. The speeds confirmed by Mr. Shaw matched those indicated by the Triconex controls.

6. Mr. Shaw's competence was called into question by the defendants at trial. However, no party ever offered any evidence to prove that Mr. Shaw was not competent or that his readings were incorrect. Mr. Shaw testified that he took speed readings from the shaft pursuant to the instructions of Mr. Niakian. Since the speeds obtained by Mr. Shaw were the same as those indicated by the Triconex control device, the Court is led to the only logical conclusion; that Mr. Shaw correctly took readings from the auxiliary shaft just as he was directed by Mr. Niakian. It is logical that Mr. Niakian would direct Mr. Shaw to the auxiliary shaft, since that is where Triconex placed the data sensors.

7. After confirmation of the speed by independent means, Greenwood Utilities adjusted the overspeed bolt in reliance on Triconex's faulty design. This led to the operation of the Turbine at a speed of at least 6,932 RPM, causing irreparable damage to the turbine.

8. The Court finds that the Triconex controls, if properly designed, should have prevented the overspeed incident regardless of the operation of the overspeed bolt.

9. Under its contract Triconex was obligated to deliver a working system. The system that was installed was defective. Accordingly, the Court finds that Triconex is liable to Greenwood Utilities for Breach of Contract.

10. The Court finds that GE did not breach its contract with Greenwood Utilities. GE had no obligation under its contract to second-guess the Triconex design.

6

11.   The Court finds that Greenwood Utilities has sustained the following losses:
1.  Initial repair contract with GE..........................$1,500,000.00
2.  Additional repair work outside the scope of the repair contract, but related to the overspeed event...........$225,806.86
3.  Collective cost to purchase additional capacity to meet contractual obligations from June, 1996 through September, 1996.......................................................................$27,500.00
4.  Prejudgment interest at the rate of 8% per annum on the $1,500,000.00 payment to GE for the repair to the unit since the date of payment in this case ($600,000.00 on 3/13/1998, $450,000.00 on 9/9/1998, and $450,000.00 on 11/21/1998) pursuant to § 75-17-7 of the Mississippi Code of 1972.  The Court calculates the pre-judgment interest to be.....$748,000.00

Total...........$2,501,306.56

12.   The Court finds that Greenwood Utilities is not entitled to all amounts included on the GE invoice for additional repair work outside the scope of the repair contract, as Mr. John Nugent of GE testified that item 1 ($2,292.10) was not related to the overspeed event, and that he did not know whether item 10 ($61,379.87) was related to the overspeed event.

13.   The Court finds that Greenwood Utilities is not entitled to the collective cost to purchase additional capacity to meet contractual obligations from July 1997 through October, 1998, or revenues lost for reduced capacity sales to MEAM from July, 1998 through September 1998, as Greenwood Utilities had a duty to mitigate its damages, which it failed to do.  *See F[r]ierson v. Delta Outdoor, Inc.*, 794 So.2d 220 (¶14) (Miss. 2001); *Wall v. Swilley*, 562 So.2d 1252, 1258 (Miss. 1990); *Lovett v. E.L. Garner, Inc.*, 511 So.2d 1346, 1353 (Miss. 1987).

14.   The Court finds that pre-judgment interest should be awarded on the cost to repair the turbine from the date of payment.  This amount was known to the parties.  The defendants assert that they should not be liable for pre-judgment interest due to the undetermined contribution of Greenwood Utilities to its own damage.  In the Court's view, this reliance on the negligence of Greenwood Utilities is misplaced.  There was never any evidence that Mr. Shaw's readings were incorrect or that he was negligent in any way.  Accordingly, it was unreasonable for the defendants to rely on Greenwood Utilities' alleged negligence as a defense.   The pre-judgment interest is awarded to compensate Greenwood Utilities for the loss of use of its money.

15.   The Court finds that the contract between Greenwood Utilities and Upchurch provided for an award of attorney's fees.  Accordingly, the

Court will conduct a post judgment hearing to determine the amount of attorney's fees.

16. It is clear that Greenwood Utilities never paid the $119,835.00 owed to Upchurch and Triconex. Accordingly, Upchurch and Triconex's motion to amend is granted. The amount of $119,835.00 is awarded to Upchurch and Triconex which shall be set-off against the judgment against Upchurch and Triconex.

17. Accordingly, Judgment shall be entered in favor of the Plaintiff, Greenwood Utilities Commission, and against Upchurch and Triconex in the total amount of $2,381,471.56.

18. The (sic) was no dispute that Greenwood Utilities is liable to GE on the counterclaim of $289,478.83. Accordingly, Judgment shall be entered in favor of GE and against Greenwood Utilities in the total amount of $289,478.83.[3]

¶10. On October 25, 2004, Upchurch and Triconex filed a Motion to Amend the Findings of Fact Pursuant to Rule 52(b) of the Mississippi Rules of Civil Procedure. Upchurch and Triconex stated in their motion, *inter alia*:

Specifically, the following Findings of Fact are not supported by substantial evidence and should be amended with the conclusions based on such findings:

A. That Mr. Shaw took readings on November 10, 1995, off of an auxiliary shaft as directed by Mr. Niakian;

B. That Mr. Shaw correctly took the readings he reported and which were relied upon by GU, GE, and Triconex;

C. That Mr. Shaw was competent to perform the task of taking accurate turbine speed readings for which he was provided by GU;

D. That Triconex's controls system was defective on November 10, 1995; and

E. Other related findings of fact and conclusions detailed in the attached Memorandum of Evidence and Authorities Submitted in Support of Upchurch Pluming, Inc.'s (sic)

---

[3]This final judgment in favor of GE and against Greenwood was entered on October 18, 2004. During the pendency of this appeal, GE was dismissed as a party by order of a three-justice panel of this Court.

8

and Triconex Systems, Inc.'s Motion to Amend Findings of Fact Pursuant to Rule 52(b) of the Mississippi Rules of Civil Procedure.

¶11.    On February 1, 2005, Judge Hines heard Greenwood's Motion for Attorney's Fees. On July 14, 2005, Judge Hines entered: (1) an order denying the Motion to Amend the Findings of Fact filed by Upchurch and Triconex; (2) an order awarding attorneys' fees to Greenwood; (3) and final judgment in favor of Greenwood and against Upchurch and Triconex, "in the amount of $2,381,471.56 pursuant to the Court's findings on October 13, 2004, plus attorney fees in the amount of $240,980.40 for a total amount owed of $2,622,451.96 . . . with post-judgment interest at the annual rate of 8% until paid. Post-judgment interest shall run on the original judgment from October 13, 2004 and on the attorney fees from the date of this order."

¶12.    On July 21, 2005, Upchurch and Triconex filed a postjudgment Motion for Judgment as a Matter of Law or, Alternatively, Motion to Alter, Amend or Vacate the Judgment, or Motion for New Trial, which Judge Hines denied on August 3, 2005.

¶13.    Upchurch and Triconex[4] then timely perfected their appeal to this Court.

---

[4]Triconex's brief states: "Triconex has assumed the defense of and is indemnifying Upchurch since all events complained of in the underlying action occurred while Triconex was onsite testing the computerized controls system for the turbine under the provisions of the Upchurch contract expressly incorporated into the Triconex subcontract." Therefore, we will refer to Triconex and Upchurch collectively as "Triconex."

**DISCUSSION**

¶14.    Eight issues are before this Court: (1) whether the factual determinations made by the trial court are manifestly wrong; (2) whether the Mississippi Uniform Commercial Code is applicable; (3) whether obtaining assistance from Greenwood during on-site testing of the control systems was a breach of contract by Triconex; (4) whether Greenwood's providing personnel and instrumentation for on-site testing waived the contractual requirement for Triconex to provide all personnel and instrumentation; (5) whether Greenwood can recover on its negligence theory; (6) whether attorneys' fees are allowed by contract; (7) whether there was sufficient proof as to the reasonableness of attorneys' fees; and, (8) whether Greenwood met the legal prerequisites to be entitled to an award of prejudgment interest.

¶15.    Questions of law are reviewed by this Court using a *de novo* standard. *A&F Props., LLC v. Madison County Bd. of Supervisors*, 933 So. 2d 296, 300 (Miss. 2006); *Harrah's Vicksburg Corp. v. Pennebaker*, 812 So. 2d 163, 170 (Miss. 2001). On the other hand, "[w]henever this Court considers on appeal a trial judge's findings of fact, we appropriately afford deferential treatment. Even though we quite often review circuit court cases based upon judgments entered after a jury trial, whenever we are called upon to consider the findings of fact of a circuit judge sitting without a jury, that circuit judge is entitled to the same deference concerning his/her findings of fact as is afforded to a chancellor, who almost always sits, without a jury." *City of Greenville v. Jones*, 925 So. 2d 106, 109 (Miss. 2006) (citing *City of Jackson v. Perry*, 764 So. 2d 373, 376 (Miss. 2000); *Puckett v. Stuckey*, 633 So. 2d 978, 982 (Miss. 1993)). In other words, if the trial judge's findings of fact are

10

supported by substantial, credible and reasonable evidence, we must afford deference to these findings on appeal, and thus, we will not disturb the trial judge's findings of fact "unless they are manifestly wrong, clearly erroneous or an erroneous legal standard was applied." *Perry*, 764 So. 2d at 376 (citing *Puckett*, 633 So. 2d at 982; *Bell v. City of Bay St. Louis*, 467 So. 2d 657, 661 (Miss. 1985)). This Court reviews a trial judge's award of attorneys' fees and prejudgment interest for abuse of discretion. *Microtek Med., Inc. v. 3M Co.*, 942 So. 2d 122, 130 (Miss. 2006); *Mabus v. Mabus*, 910 So. 2d 486, 488 (Miss. 2005) (citing *Mauck v. Columbus Hotel Co.*, 741 So. 2d 259, 269 (Miss. 1999); *Bredemeier v. Jackson*, 689 So. 2d 770, 778 (Miss. 1997)).

¶16.    We will restate the issues for clarity during the course of our discussion.

## I.    WHETHER THE FACTUAL DETERMINATIONS MADE BY THE TRIAL COURT ARE MANIFESTLY WRONG.

¶17.    Concerning this first issue, Triconex argues, *inter alia*, that the trial judge erroneously determined that Shaw took his speed readings off the auxiliary shaft, rather than directly off the turbine shaft, during the testing conducted on November 10, 1995. On the other hand, Greenwood argues that the evidence is not conclusive as to whether Shaw took his readings off the auxiliary shaft or directly off the turbine shaft. However, Greenwood argues that even if the trial judge did err, this issue is not controlling as to whether Triconex breached the contract.

¶18.    After denying Triconex's Motion to Amend the Findings of Fact, Judge Hines stated in his Order:

11

Upchurch and Triconex in their memorandum in support of the motion repeat from the transcript the following testimony of Jerry Shaw:

> Q. And where did you locate yourself with the strobe light?
>
> A. It's a little compartment behind the accessory gear box. Between there and the turbine.
>
> Q. Was there anybody who told you to select that place?
>
> A. Well, I was – I don't remember in – who particular. I suppose – Hamid, I suppose. They wanted to get on that shaft.
>
> Q. When you say "get on that shaft," what are you referring to?
>
> A. It's the shaft between the accessory gear box and the turbine.
>
> Q. So this would have been the actual turbine shaft that you were going to be shining the strobe light on.
>
> A. Well –
>
> Q. ***Or a portion.***
>
> A. Right. That's correct.

Transcript 165:2-20 (emphasis added).

The Court accepts this testimony and finds as a fact the speed measurement was taken from something attached to the shaft, but not the shaft itself. It is only logical that Hamid Niakian would tell Mr. Shaw to take the measurement there since that is where Triconex placed the speed sensor device.

The Court rejects the testimony of Lane Richard regarding the placement of the strobe device because he was not present when the events occurred, and his testimony is therefore not as reliable as Mr. Shaw's testimony. Likewise, the Court rejects the direct testimony of Bobby Bennett, Hamid Niakian, Edgar Alan Walters, because none of it was based upon eyewitness observation, but rather what each witness heard from someone else. The Court also rejects Triconex's argument that Mr. Shaw did not know how to use the strobe device. Mr. Shaw demonstrated later that he knew how to use the strobe device. See Transcript 170.

The argument presented by Upchurch and Triconex ignores a fundamental issue. Triconex designed the system using the speed of an auxiliary shaft to measure the speed of the main turbine shaft without adjusting for the fact that the shafts did not operate at the same speed. This failure occurred despite the fact that this variation in speed was detailed in the General Electric Company

manual which Triconex used in the design. This seems to the Court would be an elementary fact to an engineer.

Triconex designed a system and allowed it to be installed and operated with such a fundamental flaw that its malfunction caused a catastrophic loss. Triconex cannot hide behind the fact that they failed to bring the proper equipment or sufficient personnel to the site. If Triconex had properly designed the system and brought the proper equipment and personnel to the site, the damage to the turbine would never have occurred. This constitutes a breach of their contractual obligations. Accordingly, Upchurch's and Triconex's motion is denied.

¶19. Triconex cites specific testimony in the transcript and record in an effort to prove that Judge Hines erred in his findings of fact. Triconex argues that the testimony shows, contrary to the trial judge's findings, that Shaw took his readings directly off the turbine shaft rather than the auxiliary shaft. Triconex further argues that the evidence established that Shaw unforeseeably provided erroneous turbine speed readings on which everyone involved relied. Finally, Triconex argues that the testimony presented at trial demonstrated that Shaw was not competent to operate a Strobotac instrument. On the other hand, Greenwood presents portions of testimony that it claims support the trial judge's findings. Even though this case is obviously fact-intensive, we will set out the facts as succinctly as possible, and quote only the testimony we deem critical to this discussion, so as to avoid endless quotations from the record.

¶20. With this being said, we quote here portions of the testimony of Lane Richard, the GE engineer:

> Q.    Do you recall Dean Walters issuing a report to you saying that when he went to the plant, he and Jerry Shaw, he took his handheld digital tach

13

and Jerry Shaw took the Greenwood Utilities strobe and they both tested them against the boiler feed pump?

A.    Well, you know, actually, Jerry Shaw – I've never heard the name Jerry Shaw except in preparation for this. So he didn't mention Jerry Shaw's name, but he did mention he got with the guy with Greenwood that had used the strobotac. And it sounds familiar that they went to some piece of equipment in the plant and compared speed values.

Q.    And they got the same number.

A.    Seems like they did, yes, sir.

Q.    Which suggested whoever was operating that thing was operating it properly, correct?

A.    Yes, sir.

Q.    And then later on that day, they went out and they both sat down on the generator.

A.    Yes, sir, they did.

Q.    And Mr. Walters confirmed that he had a speed reading on the generator of 900, and he looked over and the Greenwood Utilities employee had a speed reading on the strobe of 900, or that was communicated to him.

A.    Yeah, that's correct. *And actually, it just so happened the speed ratio of that auxiliary gear shaft matches almost to the rpm the speed of the generator as well.* So, again, Triconex's readout was exactly what these guys were reading, except they were on the generator rotor. And at the time the Greenwood person, I think, made the comment to Dean, "See, right on the money." And that's when Dean said, "Wait a second, man. Right on the money, yeah, but there's a gearbox between us and the turbine."

Q.    But my point is, is that if the GE employee using the strobe is standing next to Dean Walters using the digital handheld tachometer and they're getting the same number, that doesn't suggest that the Greenwood Utilities employee was doing anything wrong in his use of the strobe, does it?

A.    That's correct.

(Emphasis added).

¶21.   It is readily apparent from the record that Judge Hines, as the fact-finder in this bench trial, acted within his discretion in finding that Shaw must have placed his Strobotac on the auxiliary shaft. Judge Hines did not pull this idea out of a hat; Richard testified that the

14

speed of the auxiliary shaft, which has a 1:1.35 ratio, matched the overspeed. The turbine shaft has a 1:1 ratio. Judge Hines, as the factfinder, had the discretion to disregard as unreliable the testimony of witnesses who were not present during the testing. We likewise find that Judge Hines acted within his discretion in finding that Jerry Shaw was competent to use the Strobotac instrument and that he used it properly. In sum, after a meticulous review of the entire record, including the testimony of the witnesses, we are left with the inescapable conclusion that Judge Hines's findings of fact are supported by substantial, credible and reasonable evidence; therefore, we will not disturb these findings on appeal, since they are not manifestly wrong or clearly erroneous. This issue is thus without merit.

## II. WHETHER THE MISSISSIPPI UNIFORM COMMERCIAL CODE IS APPLICABLE.

¶22. Triconex argues that the control system had not been "delivered" at the time of the turbine damage because the system was still being tested; accordingly, the trial court's finding that the system was defective is clearly erroneous. Triconex further asserts that the Uniform Commercial Code (UCC) provides that there can be no breach of contract where the goods in question have not been tendered, and Triconex argues that the system had not been "tendered" at the time of the testing. *See* Miss. Code Ann. § 75-2-503 (Rev. 2002).

¶23. Triconex further argues that Greenwood has failed to prove that its damages, which are all consequential damages, were foreseeable and were proximately caused by Triconex, because it was not foreseeable that Greenwood would offer an employee who was incompetent to assist in the testing and who would make a mistake.

15

¶24. Greenwood argues that the UCC is not applicable since the trial court based its ruling on Mississippi general contract law. Greenwood further argues that the contract is not for the sale of goods; it is a competitively-bid construction contract for the specially-designed system. Greenwood also argues that this Court's mixed-transactions test in *J.O. Hooker & Sons, Inc. v. Roberts Cabinet Co., Inc.*, 683 So. 2d 396, 400 (Miss. 1996) applies. In *J.O. Hooker* this Court stated:

> [W]hether or not the contract should be interpreted under the UCC or general contract law should depend upon the nature of the contract and also upon whether the *dispute* in question primarily concerns the goods furnished or the services rendered under the contract.

*Id.* (emphasis in original); *see also Anderson Const. Co., Inc. v. Lyon Metal Products, Inc.*, 370 So. 2d 935, 938 (Miss. 1979).

¶25. Greenwood asserts that only forty percent of the contract deals with hardware, while sixty percent deals with services.[5] Greenwood further asserts that the dispute is over the design of the software and the testing that occurred.

¶26. In accordance with *J.O. Hooker*, we find that the UCC does not apply. Using this Court's mixed-transactions test, the dispute in the case sub judice clearly concerns testing of the system, which is a service. Additionally, this Court finds that the contract as a whole, as

---

[5]Greenwood's brief states: "Only 40% of the contract price related to Triconex hardware, with the remaining 60% covering the following 'service' categories: site investigations; initial design; mechanical cabinet assembly; electrical cabinet assembly; specifications; software development; factory acceptance test; field design package; a second factory acceptance test; site acceptance test; start up and commissioning; and project documentation."

evidenced by Greenwood's demonstration that sixty percent of the contract related to services, was for the specialized design of the turbine by Triconex. Therefore, we find that this issue is without merit.

### III. WHETHER OBTAINING ASSISTANCE FROM GREENWOOD DURING ON-SITE TESTING OF THE CONTROL SYSTEM WAS A BREACH OF CONTRACT BY TRICONEX.

¶27. Triconex argues that the contract in question provided that "[a]t times the Owner may provide personnel to assist the Contractor's field service personnel during on-site testing." Triconex further argues that Greenwood did not object to providing Shaw, and that this type of assistance from Shaw is customary in the industry.

¶28. Greenwood argues that the trial judge held that Triconex breached the contract not by requesting assistance from Shaw, but by installing a defective control system. Greenwood further argues that the contract clearly stated that Triconex had sole responsibility for the testing. Contract 103, Article 6, stated:

> B.    LABOR, MATERIALS AND EQUIPMENT:
> 2.    Unless otherwise specified in the General Requirements, *Contractor shall furnish and assume full responsibility for all* materials, equipment, *labor*, transportation, construction equipment and machinery, *tools*, appliances, fuel, telephone, temporary facilities and all other facilities and incidentals necessary for the furnishing, performance, *testing*, start-up and completion of the Work.

(Emphasis added). Additionally, the contract states:

> B.    On-Site Testing:
> . . . .

17

3. Provide all labor and technical direction to test and start-up all combustion turbine-generator systems.

. . . .

7. Service personnel shall report with any test equipment or tools required to place the control equipment and systems into operation.

Greenwood also argues that for Triconex to rely upon the provision providing that the "*Owner* may provide personnel to *assist*" (emphasis added), Triconex must have asked Marion Flanagan, the project manager, for permission, because he was the only person who had authority as the owner.

¶29. In the end, it is irrelevant whether Triconex asked Greenwood for assistance. According to the plain language of the contract, Triconex had the burden of providing all labor, tools, and technical assistance for the testing. In other words, Triconex had sole responsibility for the testing. Thus, we find that this issue is without merit.

**IV. WHETHER GREENWOOD'S PROVIDING PERSONNEL AND INSTRUMENTATION FOR ON-SITE TESTING WAIVED THE CONTRACTUAL REQUIREMENT FOR TRICONEX TO PROVIDE ALL PERSONNEL AND INSTRUMENTATION.**

¶30. Triconex argues that the contract allowed for assistance by Greenwood personnel. Further, Triconex argues that Greenwood never objected to Shaw's assistance and, therefore, waived the contractual requirement for Triconex to provide all personnel and instrumentation. This Court has stated that the actions and pattern of conduct of the parties determine if a waiver or modification occurred. ***Sanderson Farms v. Gatlin***, 848 So. 2d 828, 837 (Miss. 2003). To determine the point at which any waiver occurs, the Court should look to the actions of the relevant party after that party has sufficient information to be on notice

18

of the alleged deviation from the contractual duty. ***Brent Towing Co., Inc. v. Scott Petroleum Corp.***, 735 So. 2d 355, 358 (Miss. 1999). If, after acquiring knowledge of the deviation from a known right articulated in the contract, a party fails to insist on its contractual rights, or acts inconsistently with such rights, then that party waives the right to require such performance. ***Id.***; ***Sanderson Farms***, 848 So. 2d at 837-38.

¶31. Triconex argues that Greenwood had notice of deviation from the contract on the date of testing and, by failing to object to providing Shaw for testing, waived Triconex's obligation to provide all personnel for testing. However, Greenwood argues that the trial judge did not base his decision on the personnel issue, but instead upon Triconex's design and installation of a defective control system. Furthermore, Greenwood argues that no "known deviation" occurred because the contract specifically states when a waiver or amendment may occur. Greenwood also argues that, according to the language of the contract, only the engineer[6] for Greenwood had the authority to modify the contract. Greenwood directs this Court to three sections of the contract:

> ARTICLE 3 – CONTRACT DOCUMENTS: INTENT, AMENDING, REUSE
> B.　　AMENDING AND SUPPLEMENTING CONTRACT DOCUMENTS:
> 　　　　1.　　The Contract Documents may be amended to provide for additions, deletions and revisions in the Work or to modify the terms and conditions thereof in one or more of the following ways:
> 　　　　　　a.　　A formal Written Amendment.
> 　　　　　　b.　　A Change Order (pursuant to Paragraph 10.A.4,)
> . . . .

---

[6]Greenwood's engineering firm was Burns and McDonnell of Kansas City, Missouri, which also wrote the contract.

3. In addition, the requirements of the Contract Documents may be supplemented, and minor variations and deviations in the Work may be authorized, in the following way:
   a. A Field Order (pursuant to Paragraph 9.E).
   b. Engineer's written interpretation or clarification (pursuant to Paragraph 9.D).

. . . .

ARTICLE 9–ENGINEER'S STATUS DURING CONSTRUCTION:
E. AUTHORIZED VARIATIONS IN WORK: Engineer may authorize minor variations in the Work from the requirements of the Contract Documents which do not involve an adjustment in the Contract Price or the Contract Time and are consistent with the overall intent of the Contract Documents. These may be accomplished by a Field Order and will be binding on Owner, and also on Contractor who shall perform the Work involved promptly.

. . . .

I. PROJECT REPRESENTATION:
   1. Owner may furnish Resident Project Representative and assistants to assist Engineer in observing the performance of the Work.

. . . .

   d. Resident Project Representative will not have authority to permit any deviation from the Contract Documents, except with the concurrence of Engineer.

Greenwood further argues that the contract specifically addressed the contractor's responsibilities:

ARTICLE 6–CONTRACTOR'S RESPONSIBILITIES
2. Unless otherwise specified in the General Requirements, Contractor shall furnish and assume full responsibility for all materials, equipment, labor. . . necessary for the furnishing, performance, testing, start-up and completion of the Work.

¶32. We agree with Greenwood that Triconex's responsibilities according to the contract were not waived. The contract stated that Greenwood employees could assist, and Shaw did

so. The contract also stated that Triconex had sole responsibility for testing. Thus, no provision of the contract was waived, and this issue is without merit.

## V. WHETHER GREENWOOD CAN RECOVER ON ITS NEGLIGENCE THEORY.

¶33. The trial judge did not rule on this issue because his holding was based upon breach of contract. Based on the ultimate disposition of this case, we need not address it.[7]

## VI. WHETHER ATTORNEYS' FEES ARE ALLOWED BY THE CONTRACT.

¶34. Where a contractual provision concerning the award of attorneys' fees is at issue, this Court will apply its rule concerning the interpretation of any contract, which is to "enforce a contract when its terms are clear and unambiguous." *Hamilton v. Hopkins*, 834 So. 2d 695, 700 (Miss. 2003) (citing *Ivison v. Ivison*, 762 So. 2d 329, 334 (Miss. 2000)); *Gulfside Casino P'ship v. Miss. State Port Auth. at Gulfport*, 757 So. 2d 250, 256 (Miss. 2000); *Delta Pride Catfish, Inc. v. Home Ins. Co.*, 697 So. 2d 400, 403 (Miss. 1997); *Century 21 Deep S. Props., Ltd. v. Keys*, 652 So. 2d 707, 717 (Miss. 1995)).

¶35. Triconex directs our attention to the provision of Contract 103, Article 13 G., regarding the award of attorneys' fees, which stated:

> G. CORRECTION OR REMOVAL OF DEFECTIVE WORK: If required by Engineer, Contractor shall promptly, as directed, either correct all

---

[7]In his findings of fact and conclusions of law, the trial judge stated, *inter alia*, that "[u]nder its contract Triconex was obligated to deliver a working system. The system that was installed was defective. Accordingly, the Court finds that Triconex is liable to Greenwood Utilities for Breach of Contract." Also, it is to be remembered that Greenwood had contracted with Upchurch, which in turn subcontracted with Triconex.

21

defective Work, whether or not fabricated, installed or completed, or, if the Work has been rejected by Engineer, remove it from the site and replace it with nondefective Work. Contractor shall bear all direct, indirect and consequential costs of such correction or removal (including but not limited to fees and charges of engineers, architects, attorneys and other professionals) made necessary thereby.

Triconex further argues that the contract allowed attorneys' fees only for the removal or correction of defective "Work," which was defined by the contract as:

1. Work shall include furnishing all Equipment and Materials, design, supervision, labor, tools, and field services required for the following:
   a. A control system upgrade for the General Electric Frame 5 CT as specified herein and as indicated on the drawings. Work to include installation of all Equipment and Materials.
   b. A control system for the HRSG and associated equipment. The HRSG control system cabinet will be installed and wired by Contract 106.

Triconex argues in its brief that no attorneys' fees were incurred by Greenwood, as Triconex voluntarily fixed the speed problem:

The only action necessary to correct the alleged defective "Work" in the instant case, was sending a field services representatives (sic) to Greenwood to verify the value for the scaling factor required to calculate turbine speed from a sensor placed on the auxiliary pump, having that field services representative correct the value in the program, and download the changes to the Triconex computer at Greenwood to implement the change. Those precise actions were in fact taken in Greenwood on February 14, 1996, by John Driskill, a field services representative for Triconex. (Ex. Vol. 5, Ex. 81). No attorney's fees were incurred to encourage or compel the subcontractor, Triconex, to correct the alleged defective work; and therefore, no award of attorney's fees is authorized under Contract 103 on the events that occurred in the instant case.

From the record before us, we find that the trial judge properly awarded attorneys' fees to Greenwood in accordance with the contract. Notwithstanding Triconex's assertions, the

22

"Work" included the installation of the system, whether or not completed. According to the contract, Triconex was responsible for replacing any defective "Work" with nondefective "Work." Greenwood had to file suit because Triconex refused to pay for the damage to the turbine. Thus, finding no abuse of discretion, and for the reasons stated, we find this issue to be without merit.

## VII.  WHETHER THERE WAS SUFFICIENT PROOF AS TO THE REASONABLENESS OF ATTORNEYS' FEES

¶36.   On July 14, 2005, Judge Hines entered an Order on the issue of attorneys' fees, which stated in its entirety:

> THIS CAUSE came before the Court on the issue of attorney fees. The Court has reviewed the attorney fees sought and finds that they meet the reasonableness requirement of the rules. The Court further finds that due to the complexity of the subject matter and the lengthy duration of the litigation that the employment of two (2) attorneys was justified. Accordingly the Court finds that the amount of attorney fees to be awarded in this cause shall be $240,980.40.

Triconex argues that Judge Hines failed to make substantive findings of fact in accordance with the *McKee* factors established by this Court in *McKee v. McKee*, 418 So. 2d 764 (Miss 1982).   Instead, Triconex argues, Judge Hines simply gave an impermissible "blanket endorsement" of Greenwood's attorneys' claimed fees and expenses, which this Court forbade in *BellSouth v. Board of Supervisors*, 912 So. 2d 436, 447 (Miss. 2005).  The *McKee* factors are adopted from Rule 1.5(a) of the Mississippi Rules of Professional Conduct, which states:

> A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following: (1) the time and labor

23

required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal services properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the location for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent.

Miss. R. Prof'l Conduct 1.5(a).

¶37.    Triconex further argues that the Court of Appeals has held that an amount to compensate for one competent attorney is the criteria upon which an award should be made. *Evans v. Evans*, 912 So. 2d 184 (Miss. Ct. App. 2005).

¶38.    Greenwood argues that it submitted itemized attorney records for time and expenses for the trial court to consider.  Furthermore, Greenwood cites Miss. Code Ann. § 9-1-41 and argues that the trial judge makes the determination of reasonableness from experience and observation.  Miss. Code Ann. § 9-1-41 (Rev. 2002) states:

> In any action in which a court is authorized to award reasonable attorneys' fees, the court shall not require the party seeking such fees to put on proof as to the reasonableness of the amount sought, but shall make the award based on the information already before it and the court's own opinion based on experience and observation; provided however, a party may, in its discretion, place before the court other evidence as to the reasonableness of the amount of the award, and the court may consider such evidence in making the award.

*Id.* Greenwood further argues that *McKee* predates the passage of Miss. Code Ann. § 9-1-41, and thus *McKee* is no longer applicable.[8]  Greenwood also argues that the *McKee* factors,

---

[8]Miss. Code Ann. § 9-1-41 was approved by the Legislature on March 13, 1990, while this Court decided *McKee* on July 28, 1982.

24

since they are adopted from Miss. R. Prof'l Conduct 1.5(a), should be applicable only to determine reasonableness in a dispute between an attorney and a client. However, we note that in *BellSouth* (a "business dispute"), even though this Court reversed the trial court's findings on attorneys fees, we discussed and applied *McKee* and the Miss. R. Prof'l Conduct 1.5(a) factors. *See BellSouth*, 912 So. 2d at 445-48.

¶39. This Court stated in *Mabus v. Mabus*, 910 So. 2d 486, 489 (Miss. 2005) that, where a trial judge relies "on substantial credible evidence in the record regarding attorney's fees," the trial judge has not abused his discretion. It is clear from the language of the trial judge's order that the judge did in fact apply the *McKee* factors even though he did not detail his reasoning. Thus, we find that Judge Hines did not abuse his discretion, and we deem it unnecessary to enter into a discussion of whether Section 9-1-41 supercedes *McKee*.

¶40. Further, this Court finds *Evans* wholly irrelevant even though, as this Court stated in *Mabus*, "the general rule is that appropriate attorney fees should be awarded in the amount to secure one competent attorney." *Mabus*, 910 So. 2d at 490. *Evans* and *Mabus* are clearly distinguishable from this case as those cases concerned divorce, where the trial judge may take into account the parties' ability to pay. This case involves a business dispute, where ability to pay is not a consideration. The trial judge did not abuse his discretion in awarding fees and expenses for two attorneys in this case, which contains complex legal issues and has been ongoing for more than a decade. Accordingly, we find that this issue is without merit.

## VIII. WHETHER GREENWOOD MET THE LEGAL PREREQUISITES TO BE ENTITLED TO AN AWARD OF PREJUDGMENT INTEREST.

¶41. This Court recently discussed the issue of prejudgment interest in *Microtek Med., Inc. v. 3M Co.*, 942 So. 2d 122, 132 (Miss. 2006), in which we stated that "[t]he trial judge no doubt has discretion to award prejudgment interest if (1) the amount of damages is fixed and (2) liability is undisputed." "Prejudgment interest has been denied where there is a bona fide dispute as to the amount of damages as well as the responsibility for the liability therefor." *Id.* (quoting *Grace v. Lititz Mut. Ins. Co.*, 257 So. 2d 217, 225 (Miss. 1972)). "For prejudgment interest to be awarded, the party must make a proper demand for the interest in the pleadings, including the date that it was allegedly due." *Id.*; *see also Simpson v. State Farm Fire & Cas. Co.*, 564 So. 2d 1374, 1380 (Miss. 1990).

¶42. Upon reflection, it is readily apparent to us that in today's case, we must clarify our holding in *Microtek*, which relied on this Court's decision in *Grace*. A study of *Grace* reveals that the primary issue was whether an insurer was responsible to its insureds under the applicable insurance policy, which provided coverage for an office building damaged in the wake of Hurricane Camille.[9] In addressing the prejudgment interest issue in *Grace*, this Court succinctly disposed of this issue by stating, *inter alia*, that the plaintiffs/appellants were not entitled to interest "because in this instance there is a bona fide dispute as to the

---

[9]Hurricane Camille struck the Mississippi Gulf Coast on Sunday night, August 17, 1969.

26

amount of damages as well as the responsibility for the liability therefor." *Grace*, 257 So. 2d

at 225.[10]

¶43.    We seized upon this language from *Grace* in *Simpson v. State Farm Fire & Cas. Co.*,

564 So. 2d 1374, 1380 (Miss. 1990), and again in *Thompson Machinery Commerce v.*

*Wallace*, 687 So. 2d 149, 152 (Miss. 1997).  The appropriate criteria for determining when

an award of prejudgment interest is proper is found in our recent opinion in *Stockstill v.*

*Gammill*, 943 So. 2d 35, 50 (Miss. 2006), where we stated:

> It is well settled that in Mississippi a [trial judge] is afforded discretion in
> deciding whether to award prejudgment interest.  "An award of prejudgment
> interest rests in the discretion of the awarding judge.  Under Mississippi law,
> prejudgment interest may be allowed in cases where the amount due is
> liquidated when the claim is originally made or where the denial of a claim is
> frivolous or in bad faith.  No award of prejudgment interest may rationally be
> made where the principal amount has not been fixed prior to judgment." *Coho*
> *Res. v. McCarthy*, 829 So. 2d 1, 19-20 (Miss. 2002) (quoting *Warwick v.*
> *Matheney*, 603 So. 2d 330, 342 (Miss. 1992)).  *See also* *Tupelo Redev.*
> *Agency v. Abernathy*, 913 So. 2d 278, 286 (Miss. 2005).

*Id.* at 50.  Thus, in sum, we today clarify this issue as discussed in *Grace* and its progeny,

including *Microtek*, by stating that when considering the issue of prejudgment interest, the

trial court, and the appellate court upon review, should remember that prejudgment interest

may be allowed in those cases where the amount due is liquidated when the claim is

originally made or where the denial of a claim is frivolous or in bad faith.

---

[10]Perhaps a better way to state this principle is that prejudgment interest may not be
awarded unless the amount due is liquidated when the claim is originally made or where the
denial of a claim was frivolous or in bad faith.

¶44. The motion for rehearing likewise asserts error by this Court in awarding prejudgment interest because the complaint does not contain a specified date on which prejudgment interest allegedly became due. To address this issue we feel compelled briefly to review this Court's judicial enactment of the Mississippi Rules of Civil Procedure, which became applicable to all civil actions filed on or after January 1, 1982. As of the effective date of our civil procedure rules, Mississippi became a "notice pleadings" state. *See* Miss. R. Civ. P. 8 and *Comment* thereunder. No doubt, prior to the Mississippi Rules of Civil Procedure, technical pleading requirements existed. This Court's cases prior to the enactment of our civil procedure rules required a plaintiff to specifically demand prejudgment interest in the complaint and to also specify the date from which the prejudgment interest was due. *See, e.g., Md. Cas. Co. v. Legg*, 247 So. 2d 812, 814 (Miss. 1971).

¶45. Miss. R. Civ. P. 8(a) provides:

> (a) Claims for Relief. A pleading which sets forth a claim for relief, whether an original claim, counter-claim, cross-claim, or third-party claim, shall contain
> (1) a short and plain statement of the claim showing that the pleader is entitled to relief, and,
> (2) a demand for judgment for the relief to which he deems himself entitled. Relief in the alternative or of several different types may be demanded.

*See also* Miss. R. Civ. P. 8(e). In applying this rule, we stated in *Church v. Massey*, 697 So. 2d 407, 412 (Miss. 1997) that "the comment to that rule states that '[t]he purpose of Rule 8 is to give notice, not to state facts and narrow the issues as was the purpose of pleadings in prior Mississippi practice.'" *Id.* However, as recently as our decision in *Preferred Risk Mut. Ins. Co. v. Johnson*, 730 So. 2d 574, 578 (Miss. 1998), this Court stated:

28

A party must make a proper demand for the interest in the pleadings, *including the date that it was allegedly due*. [*Wirtz v. Switzer*], 586 So. 2d [775] at 785 [(Miss. 1991)]; *Thompson Mach. Commerce Corp. v. Wallace*, 687 So. 2d 149, 152 (Miss. 1997); *Simpson*, 564 So. 2d at 1380.

*Id.* at 578. (Emphasis added). Accordingly, insofar as *Preferred Risk* can be interpreted to stand for the proposition that a pleader's failure to allege in the complaint the specific date on which prejudgment interest is due is fatal to a claim for prejudgment interest, *Preferred Risk* (and any other case so holding) is overruled to this limited extent. We wish to make clear today that while Miss. R. Civ. P. 8 does require that a party assert a demand for prejudgment interest in the appropriate pleading; on the other hand, Rule 8 does not require that a party seeking prejudgment interest must plead the specific date on which the prejudgment interest allegedly is due.

¶46. With all this having been said, we now return to today's case. First, Triconex argues that Greenwood's damages claim was not for a liquidated amount, because the trial court found that Greenwood failed to mitigate its damages; that GE was not entitled to some of the charges for additional repair work; and that Greenwood could not recover for the costs to purchase additional capacity or lost revenue due to reduced capacity. However, Greenwood argues that the amount obviously became liquidated when the money was paid by Greenwood, and the trial court used those dates in its calculations. Greenwood further argues that this Court requires only that amounts must be liquidated "prior to judgment." *Preferred Risk Mut. Ins. Co. v. Johnson*, 730 So. 2d 574, 577 (Miss. 1998).

29

¶47. The amounts were liquidated when paid and certainly prior to judgment, as Greenwood received bills for the amounts required to repair the damage to the turbine. Accordingly, there can be no bona fide dispute as to the amount of damages, as these bills came due prior to the judgment entered by Judge Hines. Thus, the damages were fixed when Greenwood received the bills.

¶48. Next, Triconex argues that Greenwood simply demanded prejudgment interest in its complaint without stating an amount or the date from which it was allegedly due. As we have clarified the law on this issue *supra*, Greenwood was required only to make a demand for prejudgment interest, and Greenwood's failure to state a specific date in its complaint does not relieve Triconex from being responsible for prejudgment interest.

¶49. Triconex directs this Court to its decision in ***Theobald v. Nosser***, 784 So. 2d 142, 145 (Miss. 2001), and argues that ***Theobald*** stands for the proposition that a plaintiff must state a specific date from which prejudgment interest is allegedly due in the pleadings. However, this Court stated in ***Theobald***:

> The Nossers assert that the Theobalds did not request prejudgment interest until the hearing before the chancery court after this Court had issued its opinion. That assertion is supported by the chancery court, which found that the Theobalds did not make a proper demand for prejudgment interest, and by the Theobalds' own complaint, which specifically asked for "legal interest **after** date of judgment." In light of all these factors, we conclude that the chancery court did not abuse its discretion in denying the Theobalds prejudgment interest.

*Id.* (emphasis in original). Thus, this Court specifically emphasized that the Theobalds demanded interest after the date of judgment, which is distinguishable from this case.

30

Greenwood clearly asked for prejudgment interest in its complaint. Greenwood's failure to state a specific date in its complaint does not relieve Triconex from being responsible for prejudgment interest.

¶50. Finally, Triconex argues that prejudgment interest is not authorized by statute. Triconex argues that Miss. Code Ann. § 75-17-1(1) (Rev. 2000) allows trial judges to award prejudgment interest only where expressly provided in the contract. Miss. Code Ann. § 75-17-1(1) states:

> The legal rate of interest on all notes, accounts and contracts shall be eight percent (8%) per annum, calculated according to the actuarial method, but contracts may be made, in writing, for payment of a finance charge as otherwise provided by this section or as otherwise authorized by law.

*Id.* However, Greenwood argues that Miss. Code Ann. § 75-17-7 (Rev. 2000) is the applicable statute and allows trial judges the discretion to award prejudgment interest. Miss. Code Ann. § 75-17-7 states:

> All judgments or decrees founded on any sale or contract shall bear interest at the same rate as the contract evidencing the debt on which the judgment or decree was rendered. All other judgments or decrees shall bear interest at a per annum rate set by the judge hearing the complaint from a date determined by such judge to be fair but in no event prior to the filing of the complaint.

*Id.* We find that Miss. Code Ann. § 75-17-7 is the applicable statute. The trial judge relied on Miss. Code Ann. § 75-17-7 in his Finding of Facts and Conclusions of Law. Thus, the trial judge acted well within his authority by awarding prejudgment interest. For these reasons, and finding no abuse of discretion on the part of the trial judge, we find this issue to be without merit.

31

## CONCLUSION

¶51. For the reasons discussed, we affirm the Leflore County Circuit Court's final judgment entered in favor of Greenwood Utilities Commission and against Upchurch Plumbing, Inc., and Triconex Systems, Inc., in the total amount of $2,622,451.96, plus post-judgment interest.

¶52. **AFFIRMED.**

**SMITH, C.J., WALLER AND DIAZ, P.JJ., EASLEY, DICKINSON AND RANDOLPH, JJ., CONCUR. GRAVES, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. LAMAR, J., NOT PARTICIPATING.**