DICKINSON, Presiding Justice,
for the Court:
¶ 1. A judgment creditor served writs of execution on two corporations whose restricted stock was owned by the judgment debtor, who then sold his stock back to the corporations. The chancellor dismissed the writs, holding that the sale of stock rendered them moot.
*738 ¶ 2. We hold today that statutory restrictions[1] on the transfer of restricted shares of corporate stock apply to both voluntary and involuntary transfers of the shares; that — after a judgment creditor serves a corporation with a writ of execution regarding one of its shareholders— repurchasing the shareholder’s shares will not excuse the corporation from responding to the writ of execution by filing the statutorily required[2] sworn statement; and that the judgment creditor may — to the extent allowed by Mississippi statutes and other applicable law — execute on all benefits due the judgment debtor by the corporation, including the purchase price of the judgment debtor’s stock.
¶ 3. These three consolidated appeals— all springing from a divorce granted in 1994 — present thirty-eight issues including one of first impression. Because we are reversing the chancellor on three issues and remanding for a new trial; and because the chancellor’s resolution of those issues may affect the outcome of others, we hold that all issues not specifically resolved in this opinion may be presented by the parties to the chancellor for adjudication.
BACKGROUND FACTS AND PROCEEDINGS
¶ 4. When Charles Timothy West (“Tim”) and Deborah Gayle Thornton West (“Debbie”) divorced in November 1994, their property settlement agreement (“Agreement”) required Tim to pay child support and to make “bi-weekly periodic payments of one-half of [his] income” as alimony. Debbie was also “entitled to and shall be vested with one half (½) of all existing marital assets.”
¶ 5. At the time of the divorce, Tim was employed by West Quality Food Services, Inc. (“West Quality”); he owned stock in West Quality and Coastal Express, Inc. (“Coastal”); and he held limited partnership interests in West Leasing Company, West Brothers Leasing Company, and West Family Leasing Company (“the West Leasing Companies”). All of these entities (“West Entities”) are closely-held family businesses.

WEST I

¶ 6. After five years had passed, relying on advice of counsel, Tim reduced his alimony payments according to calculations provided by West Quality’s accounting firm, Horne, LLP. Debbie filed a contempt action, and Tim counterclaimed, arguing that the Agreement’s alimony and property-division provisions were ambiguous and unenforceable; and that — because the Agreement did not define the term “marital assets” — Debbie was not entitled to an ownership interest in half of his business assets.
¶ 7. On April 30, 2002, the chancellor entered an interlocutory judgment, finding that Tim and Debbie never actually had reached an agreement on alimony and division of property, and that the issue should be presented to the court anew. Debbie filed an interlocutory appeal, arguing the trial court erred in (1) holding the provisions of the Agreement null and void; (2) failing to determine that $411,000 in corporate loans to Tim were actually distributions, in which she was entitled to share; (3) failing to determine that Tim breached his obligations under a predivorce death-benefit agreement. Debbie also argued that she was entitled to attorneys fees, and that — absent the parties’ consent — the chancellor had no jurisdiction or authority to void the Agreement and start over. *739 Finally, Debbie argued that the chancellor had erred in quashing her subpoena for certain West Quality documents.
¶ 8. We granted Debbie’s application for interlocutory appeal. We held that the portion of the Agreement titled “Support and Division of Income for Wife” was ambiguous, and we resolved the ambiguity by finding it awarded Debbie periodic alimony.[3] And because Tim had reduced his payments, we remanded for a determination of whether there had been a material change in circumstances that warranted the reduction.[4] We also held that the property settlement portion of the Agreement was not ambiguous.[5]

WEST II

¶ 9. After we remanded, Debbie filed an amended complaint, adding the West Entities as defendants, claiming they had conspired with Tim to deprive her of her portion of distributions to Tim by disguising the distributions as “loans” from Coastal Express and West Quality. Following extensive discovery, the chancellor dismissed the West Entities as parties and, finding Debbie had no reasonable basis to pursue a claim against West Entities, ordered Debbie to pay their attorneys’ fees.
¶ 10. At the conclusion of the trial, the chancellor issued an extensive, fifty-two-page opinion and final judgment, in which he found that:
1) the November 1994, judgment of divorce was enforceable;
2) Debbie was entitled to one-half of the marital assets; that the law of the case prohibited Tim from relitigating what this Court already had decided; and that Debbie was entitled to a one-half interest in the West Entities, but only if certain transfer restrictions contained in the West Quality stock agreement were lifted;
3) Debbie was entitled to $570,792 in past-due alimony with an interest rate of seven percent, and that all future alimony payments should be calculated using the “Horne” method;
4) the money transferred from West Quality to Tim was in the form of loans and not distributions;
5) Tim was in civil contempt for refusing to comply with the Agreement obligations;
6) Tim breached his duty to keep Debbie informed about financial information, and he must provide Debbie with certain financial documents;
7) Tim breached his obligation to maintain certain life-insurance policies;
8) Tim’s alleged violation of an insurance-policy-death-benefit agreement was moot;
9) Debbie was not entitled to any interest in West Investments;
10) Tim was not entitled to a modification of his alimony obligations;
11) Tim was entitled to child support;
12) Debbie was entitled to attorneys’ fees totaling $262,468.53; and
13) the West Entities were entitled to attorneys’ fees.
¶ 11. From the chancellor’s order, both Tim and the West Entities appealed, and Debbie cross-appealed.

WEST III

¶ 12. While the appeal of West II was pending, Debbie filed discovery requests *740 on the issue of the West Entities’ attorneys’ fees. Then, on June 9, 2009, after holding a hearing, the chancellor entered an order stating that “West Entities were wrongfully made parties to the action,” and they were “entitled to attorneys’ fees and expenses.” He ordered Debbie to pay $41,063.71 in attorneys’ fees. He later reduced the amount to $33,366.71, from which Debbie has filed a separate appeal.

WEST IV

¶ 13. On November 18, 2008, Debbie attempted to collect her judgment for past-due alimony and attorneys’ fees by filing a writ of execution on Tim’s distributions from, and shares of stock in, West Quality and Coastal. Tim and West Quality responded with motions to stay, dismiss, or quash the writ, pointing out the prohibitions in the West Quality bylaws and stock agreement. The chancellor stayed the writ of execution and requested briefs on the effect of the restrictions.
¶ 14. Meanwhile, the corporation demanded repayment of the loans they had made to Tim. Tim responded that he would have to sell his stock to pay the loans, so he sold his West Quality stock back to West Quality for $1,552,804, and his Coastal stock to back Coastal for $87,953. West Quality retained the bulk of the stock-sale proceeds-$l,172,205-in satisfaction of Tim’s debt. The corporations satisfied the balance of the purchase price of Tim’s stock by executing separate promissory notes at 2.96% interest, payable in annual installments.
¶ 15. As a result of the stock sale, the chancellor denied Debbie any relief on her writ of execution, finding it was nullified by his previous stay order and the stock sale. Debbie appealed this decision. We have consolidated all of these appeals.[6]
ANALYSIS
¶ 16. Our standard of review for the issues we address today is well-understood: We will affirm a chancellor’s findings of fact when they are supported by substantial evidence, unless the chancellor abused his or her discretion, was manifestly wrong, was clearly erroneous, or applied an erroneous legal standard.[7] It is a chancellor’s duty to determine the weight and credibility due a witness’s testimony.[8] We review questions of law de novo.[9]
The chancellor applied an erroneous legal standard regarding Tim’s request for a reduction in periodic alimony.
¶ 17. In considering the alimony issue initially, the chancellor expressed understandable frustration with the Agreement’s unusual alimony provisions. He held they were ambiguous and void. But for reasons stated in West I, we reversed and remanded, finding that the provisions were enforceable, and that the alimony was periodic.[10]
¶ 18. Upon remand (West II), Tim argued a reduction in his income justified a corresponding reduction in alimony. But the chancellor refused to consider any reduction in alimony, stating:
This court would like to grant Tim’s request for modification because the *741 agreement is cumbersome, it is extremely difficult to calculate what he owes in alimony, and because the complex nature of the agreement does nothing but encourage never-ending litigation. However the Supreme Court [in West I ] has made it clear that the agreement should be enforced.
¶ 19. Tim appeals, arguing that the chancellor should have considered and applied the Armstrong[11] factors to his request for reduction of alimony.
¶ 20. We indeed held in West I that the Agreement’s alimony provisions were enforceable.[12] But that holding was not based on contract law. It was based on the fact that, in his decree granting Tim and Debbie a divorce, the chancellor stated that the Agreement was “confirmed, approved and adopted by as a part of the Final Judgment.” And while it is true that property-settlement agreements are, in many respects, enforceable contracts, they do not trump a chancellor’s obligation to decide alimony, property-division, and child-support issues based on established legal principles.
¶ 21. In this case, the Agreement’s alimony provision—which this Court determined in West I to be periodic alimony— served as a guideline for the chancellor to determine appropriate alimony. But when the Agreement was incorporated into the final divorce decree, its alimony provisions became an enforceable court award of periodic alimony, subject to modification upon a proper showing of a material change in circumstances.[13]
¶ 22. Periodic-alimony awards are based on need and ability to pay—not contract law.[14] And while our decision in West I did preclude any modification of the Agreement’s alimony provision based on ambiguity, it did not prevent Tim from seeking a modification based on a material change in circumstances. Indeed, we stated in West I that, on remand, the chancellor was to “consider ... whether there was a material change in circumstances which clearly resulted in an inability to pay....”[15]
¶23. For the reasons stated, we reverse the chancellor and remand for a determination of whether a material change in circumstances exists and, if so, whether it merits a change in the chancellor’s award of periodic alimony. And we instruct the chancellor to apply the Armstrong factors to make the determination.
The chancellor did not err in finding that Debbie West was entitled to one-half of all distributions paid to Tim West.
¶ 24. Under the Agreement’s “Division of Marital Property” language, Tim agreed—and the chancellor approved—the following provision:
*742 It is the intention of the Husband and the Wife to benefit and to share equally the employment and business income of Husband.... Husband acknowledges, and it is the intention of both parties to make a present transfer to Wife of a one-half (½) vested equitable ownership interest in said properties [referring to marital assets, including, but not necessarily limited to, stocks, limited partnerships and business assets] as a division of marital assets, while married, and this Agreement constitutes an existing equitable lien to the Wife of one-half (½) of said properties.
¶ 25. Unlike periodic alimony, this provision divided the Wests’ property as it existed at the time of the divorce. It is not subject to change.
¶ 26. Tim argues that, because the provision does not include or mention the word “distribution,” the chancellor erred by finding that Debbie was entitled to half of his distributions from the entities that existed at the time of the divorce. We disagree.
¶ 27. Tim cannot credibly argue that he did not intend to transfer to Debbie an equitable interest in all of the business interests he held at the time the agreement was signed. These business interests included his stock and his ownership in the limited partnerships. An equitable title provides a “beneficial interest” in property,[16] meaning an interest in the benefits.[17] A “beneficial interest” can be nothing less than an interest in the benefits. And since distributions to stockholders and owners are a benefit, we cannot say the chancellor was manifestly wrong in holding that Debbie was entitled to her share of the distributions.
¶ 28. The Agreement provided that Tim would share with Debbie all benefits, including distributions, that resulted from his ownership interest in the stock and partnerships that existed at the time the agreement was signed. Tim’s salary, on the other hand, was not a benefit of his ownership interest, but rather his pay for work. His salary — and any change in Debbie’s financial condition — may certainly be considered in evaluating Tim’s ongoing periodic-alimony obligation. But Debbie was awarded an equitable interest in Tim’s stock and other business interests — as they existed at the time the Agreement was signed. And we cannot say the chancellor erred in this regard.
The chancellor did not err in failing to void the provisions of the Agreement concerning Debbie’s interest in Tim’s stock due to the shareholder and partnership restrictions on transfer agreements.
¶ 29. Tim argues that, because of transfer restrictions, the chancellor should have voided the Agreement’s provisions that purported to transfer to Debbie an interest in his stock. His brief is riddled with such statements as: “The chancellor should have voided the provision of the Agreement whereby [he] attempted to transfer and lien his interest in West Quality ...,” and “The West Quality shareholder agreement provides that a shareholder may not dispose of his stock nor can the shareholder lien his interest in the stock,” and “a transferee acquires no right in the shareholder’s stock absent compliance with this agreement.”[18]
¶ 30. We have carefully reviewed Debbie’s arguments before the trial court, her writs of execution, and her briefs before this Court; and we do not find that she *743 attempted to acquire title to, nor place a lien on, Tim’s stock. Instead, she claims her equitable interest in the stock entitles her to share in the benefit. For reasons discussed later in this issue, as it affects distributions going forward, is now moot.
¶ 31. The Agreement clearly recognized that Tim would remain the legal owner of the stock, but it just as clearly announced Tim’s intent to grant Debbie half of every benefit that resulted from his ownership interests in the businesses. This is consistent with the Agreement’s specific language: “Husband acknowledges, and it is the intention of both parties, to make a present transfer to Wife of a one-half (⅛) vested equitable ownership interest in said properties as a division of marital assets, while married.... ” The chancellor found this agreement to be reasonable when he granted the divorce and incorporated the property-settlement agreement into the decree.
¶ 32. Tim now argues that the provision is void because his stock was restricted. But he provides us no reason why the restricted nature of his stock prevents him from dividing the financial benefits of the stock with whomever he pleases. Because Debbie’s claim is to an equitable interest in — not legal title to — Tim’s stock and business interests, we hold that Tim’s transfer of an equitable interest in his business holdings was valid, binding, and enforceable; and this issue is without merit.
The chancellor did not err in finding that Tim breached the provisions of the Agreement by failing to pay life-insurance premiums.
¶ 33. The Agreement, referencing a life-insurance policy with Franklin Life Insurance Company, provides that Tim and Debbie would each pay half of the $260 monthly premium. Tim stopped paying the premiums and allowed the accumulated cash value to pay the premiums. Also, Debbie withdrew some cash value without Tim’s consent. These decisions were contrary to a provision in the Agreement that prohibited use of cash value, absent agreement of both parties.
¶ 34. The chancellor mistakenly held that — because the Agreement did not provide what would happen if one party withdrew cash value without the consent required by the Agreement — Debbie did not violate the Agreement by withdrawing cash value without Tim’s consent. In this regard, the chancellor overlooked the fact that, when he incorporated the property-settlement agreement into the divorce decree, its provisions regarding child support, property settlement, and alimony ceased being contractual in nature and became part of an enforceable court order.
¶ 35. We find, however, that both parties violated the provision, and the chancellor fashioned a reasonable and equitable remedy whereby Tim is required to obtain a term-life policy with the same premium required by the Agreement. We do not find the chancellor’s decision was an abuse of discretion, and we affirm the chancellor on this issue.
The chancellor should have found Debbie in contempt and in breach for withdrawing the cash value from the life-insurance policies.
¶ 36. Tim argues that chancellor should have held Debbie in contempt for withdrawing part of the life-insurance cash value without his consent, as required by the Agreement/court order. While we hold the chancellor incorrectly found Debbie did not violate the Agreement by withdrawing cash value, we find the chancellor’s remedy was fair and equitable. As stated above, both Debbie and Tim violated the Agreement by wrongfully withdrawing cash value. The chancellor may, at his discretion, revisit this issue on remand.
*744 The chancellor erred in finding that Tim breached the provisions of the Agreement requiring him to furnish certain financial information to Debbie.
¶ 87. The chancellor stated in his findings of fact that “Tim has the duty to keep Debbie informed of his financial status as required by the Agreement and that he has breached that duty.” Tim argues that the chancellor provided no basis for this statement and holding. We agree. We find nothing in the chancellor’s findings of fact or orders that establishes when or how Tim breached his duty to provide financial information.
¶ 38. Although the chancellor did not hold Tim in contempt, Tim is entitled to know what facts support a finding that he breached his obligation under the Agreement. We reverse the chancellor’s finding that Tim was in breach of the Agreement for failing to provide financial information to Debbie. If necessary, the issue may be presented to the chancellor anew on remand.
The chancellor did not abuse his discretion in finding that the loans and “113 account” advances to Tim were legitimate loans.
¶ 39. Debbie claims that her equitable interest in Tim’s stock entitled her to half of certain constructive distributions West Entities made to Tim, or for his benefit. These distributions were made in three forms: First, West Quality made direct loans to Tim. Second, West Quality loaned Tim money which he, in turn, loaned to Coastal. Third, West Quality paid various expenses for Tim, including income taxes and attorneys’ fees, which it carried on its books as an account receivable. The parties refer to this account receivable as the “113 account.”
¶ 40. In West I, we remanded Debbie’s constructive-transfer issue with instructions to the chancellor to decide if $411,000 in transfers from West Quality to Tim were loans or constructive distributions.[19] On remand, Debbie made a new claim that, in order to deprive her of her equitable interest in Tim’s corporate distributions, and in addition to the loans discussed in West I, the West Entities fraudulently transferred nearly $800,000 to Tim in the form of 113 account advances.
¶ 41. On remand, the chancellor held that these transfers to Tim were legitimate loans — not distributions. As we suggested in West 1,[20] the chancellor applied the Al-terman[21] factors and examined all the evidence, including testimony from three lay witnesses about the transfers and their legitimate purpose, as well as the testimony of a certified public accountant who provided unrebutted evidence of the companies’ financial practice and history of making similar loans — a practice whose origin predated the divorce by several years, eliminating the possibility that the loans were manufactured to deprive Debbie of her interest — an interest not created until years later.
¶ 42. Absent an abuse of discretion or clearly erroneous findings, we decline to disturb the chancellor’s decision, which, on this issue, was supported by substantial evidence. So on this issue, we affirm the chancellor’s finding that the transfers to Tim were legitimate loans.
The chancellor erroneously held that Tim’s sale of his stock mooted Debbie’s writ of execution and erroneously denied Debbie’s Rule 52 motion for findings of fact and conclusions of law.
¶ 43. On November 19, 2008, in an attempt to collect judgments in excess *745 of a million dollars for past-due alimony, attorney fees, and interest, Debbie served West Quality and Coastal with writs of execution “upon the stock, shares, or interest of [Tim].” Rather than responding to the writ with a sworn statement setting forth the value of Tim’s “stock, shares, or interest” as required by statute,[22] West Quality and Coastal filed motions to quash the writs. Tim filed a motion to stay the writs, and for an injunction, claiming that his stock was “subject to liens of the corporation, and restrictions on transfer.”
¶ 44. At a hearing on the motions, the chancellor — after hearing lengthy arguments from counsel concerning whether Debbie could execute on restricted stock— said:
My question is, does anybody have any law on the subject? At first blush, when you have a closely-held corporation such as you have in this case and the shareholders have restricted their stock by agreement with the corporation and among themselves, I don’t think that a judgment creditor can come in and take that stock and sell that stock at a sheriffs sale with those restrictions on it.
¶ 45. The chancellor then stated that he was abating execution on the writs “[t]o give [Debbie’s counsel] an opportunity to submit some authority to the Court on the question-and law on the question.” One of Coast Entities’ counsel requested, and was granted, an opportunity to respond to the brief to be submitted by Debbie’s counsel. With respect to the West Entities’ motions to quash the writs, the chancellor entered an order on December 1, 2008, finding that “the Writ of Execution is stayed and abated until further order of this Court.” On December 15, 2008, he entered a similar order with respect to Tim’s motion to stay the writs.
¶46. The chancellor ordered briefing, with Tim’s brief (after an extension was granted) due on February 6, 2009. But a few days before his brief was due, Tim sold his West Quality and Coastal stock back to the respective companies. Rather than paying Tim the $1,552,804 purchase price for its stock, West Quality applied $1,172, 205 to satisfy Tim’s loans and other debts to the company, and gave him a promissory note for the $380,599 balance. Coastal gave Tim a promissory note for the entire $87,953 purchase price of its stock. Then, rather than providing briefs on the question of whether Debbie could execute on restricted stock, West Quality and Coastal filed answers to Debbie’s writ of execution, claiming the writs were mooted by their purchases of Tim’s stock.
¶ 47. On October-20, 2009, the chancellor held a hearing on the issues surrounding Debbie’s writs of execution. His order, entered the following month, held that the motion to quash the writ of execution was moot because
the Court nullified and abated the subject Writs of Execution in its order, entered December 1, 2008. Accordingly, the subject property at issue in the Writs of Execution was free from any encumbrance resulting from the Writs of Execution at the time the stock transfer occurred, and [West Quality and Coastal] were free to acquire the stock at issue under the transactions of February 1, 2009.
¶ 48. After the chancellor entered the order, Debbie moved for Rule 52[23] findings of fact and conclusions of law, arguing that the appellate court would have no way to know the basis of the order. The chancellor denied the motion.
*746 ¶ 49. It is uncontested that, when she served the writs of execution on West Quality and Coastal, Debbie held a valid, enrolled judgment against Tim for which no supercedeas bond was filed. So at the time the writs were served, Debbie was a judgment creditor. And according to law, upon service of the writs on West Quality and Coastal,
[t]he stock, shares and interest of the defendant in the corporation or company, including all dividends that may accrue after such levy, shall be bound by the lien of the execution or attachment.[24]
¶ 50. So when Debbie served the writs, she was entitled to execute on Tim’s “stock, shares and interest” in both West Quality and Coastal, and her right to the proceeds to satisfy her judgment was and is a matter of the law of priority of liens. This issue was never addressed by the trial court.
¶ 51. Upon receipt of service of the writs, West Quality and Coastal had the statutory duty to deliver “a written statement in writing, under oath, of the particulars demanded by the officer, and of the value of the defendant’s stock, shares, or interest.”[25] They never did. Instead, they filed motions to quash the writs, and then purchased Tim’s stock, paying in excess of $1.6 million, all of which they continued to hold during the proceedings.
¶ 52. So, prior to the stock sale, West Quality and Coastal had an obligation to report Tim’s stock holdings. After the sale, they had a duty to report that they were holding the proceeds, and to make them available to Tim’s creditors, according to the rules of priority of liens. This they did not do. We therefore must remand this matter for the chancellor to review the facts and apply the law of priority of liens.
Debbie was entitled to prejudgment interest on the award of past-due alimony.
¶ 53. On remand, the chancellor awarded Debbie $570,792 in past-due alimony and simple interest at seven percent per annum. Tim appeals, arguing that the chancellor should not have granted Debbie prejudgment interest on her alimony award, because the amount was disputed. He cites Microtek Medical, Inc., v. 3M Co. in which this Court stated that the trial judge has the discretion to award prejudgment interest if the damages amount is fixed and liability is undisputed, but the court will deny interest when there is a bona fide dispute concerning the amount of damages and the liability.[26]
¶ 54. Debbie correctly points out that we recently clarified the Microtek holding, making clear that “prejudgment interest may be allowed in those cases where the amount due is liquidated when the claim is originally made or where the denial of a claim is frivolous or in bad faith.”[27] Additionally, “[i]t is settled beyond question by the decisions of this Court that, after alimony has accrued, there is a vested right thereto, and that interest is allowed thereon.”[28] Under these holdings, it is clear that Debbie is entitled to an award of prejudgment inter *747 est on the past-due alimony, and we affirm the chancellor’s ruling.
The chancellor did not commit error in dismissing West Entities.
¶ 55. During the hearing on the West Entities’ motion to dismiss, the chancellor asked Debbie’s counsel to explain the specific things the West Entities did or failed to do that caused them to be a party to a fraudulent conveyance. Debbie’s counsel answered, “They loaned the money. They gave the money.” Her attorney went on to say that “[w]hat we alleged in the amended complaint, and the relief we sought relating to [the fraudulent conveyance count] is a determination that those sums are in fact a fraudulent conveyance.” The chancellor granted the motion to dismiss, explaining that “[t]he fact that a corporation loaned money to a stockholder in and of itself would be insufficient for the Court to determine that they’ve participated in a fraudulent conveyance.”
¶ 56. On appeal, Debbie argues that the chancellor erred in granting the West Entities’ motion to dismiss and their motion for attorneys’ fees. Reviewing these issues de novo, we affirm the dismissal of the West Entities and the award of attorneys’ fees to be paid by Debbie.
Appeal No. 2009-CA-01877
¶ 57. Debbie asserts that the chancellor erred in awarding fees for services prior to the filing of her complaint against them, and that he failed to consider the McKee[29] factors. We affirm the chancellor’s award because it was not manifestly wrong.[30]
¶ 58. Debbie filed her amended complaint — ¡joining the West Entities as defendants and asserting the transfers between them and Tim were fraudulent conveyances — on April 21, 2006. The chancellor’s award of attorneys’ fees included services rendered from August 2005. We disagree that the chancellor erred in awarding fees for services performed before Debbie filed or served the complaint officially joining the Entities as parties, because the West Entities incurred attorneys’ fees for producing numerous documents in response to subpoenas issued by Debbie in 2005, and they continued to incur fees because of Debbie’s motion to amend her complaint in September 2005. Although the trial judge did not include an analysis of the McKee[31] factors in his judgment, his award was not unreasonable, so we affirm.

All other issues are remanded.

¶ 59. The parties have raised numerous other issues. We find that all issues raised which are not specifically adjudicated in this opinion are remanded for presentation to the chancellor anew. The chancellor’s determination of these issues will necessarily depend, to some degree, on his determination of the priority issue with respect to Debbie’s writs of inquiry, and on Tim’s issue with respect to alimony.
CONCLUSION
¶ 60. We affirm in part, reverse in part and remand for a new trial. The parties may present to the chancellor — for a decision on the merits — any issue not specifically resolved by this opinion. We reverse and remand for the chancellor to determine whether a material change in circumstances merits a change in Tim’s periodic-alimony obligation. We affirm the chancellor’s decision finding that Debbie is enti- *748 tied to half the distributions from the entities that existed at the time of the divorce; we hold the chancellor did not err in failing to void the provisions of the Agreement concerning Debbie’s interest in Tim’s stock due to the shareholder and partnership restrictions. We affirm the chancellor’s decision requiring Tim to obtain a term-life policy with the same premium required by the agreement. We reverse and remand the chancellor’s finding that Tim breached his duty to keep Debbie informed of his financial status. We affirm the chancellor’s finding that the loans and “113 account” advances to Tim were legitimate loans. We reverse the chancellor’s finding that Tim’s sale of his stock mooted Debbie’s writs of execution. We find the chancellor abused his discretion in failing to make Rule 52 findings of fact and conclusions of law, as requested by Debbie. We affirm the chancellor’s award to Debbie of prejudgment interest. We affirm the chancellor’s award of attorneys’ fees to West Entities.
¶ 61. AS TO 2008-CA-01700-SCT: ON DIRECT APPEAL: AFFIRMED IN PART; REVERSED IN PART AND REMANDED. ON CROSS-APPEAL: AFFIRMED IN PART; REVERSED IN PART AND REMANDED. AS TO 2009-CA-01877-SCT: AFFIRMED. AS TO 2010-CA-00316-SCT: REVERSED AND REMANDED.
CARLSON, P.J., LAMAR, PIERCE AND KING, JJ., CONCUR. KITCHENS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., AND CHANDLER, J. RANDOLPH, J., NOT PARTICIPATING.

. See Miss.Code Ann. § 79-4-6.27 (Rev.2009).

. Miss.Code Ann. § 13-3-129 (Rev.2002).

. West v. West, 891 So.2d 203, 213 (Miss.2004) ("West I’’).

. Id. at 212.

. Id. at 218-19.

. West I, 891 So.2d 203 (Miss.2004), case number 2002-IA-00158, is a part of this consolidation for record purposes.

. Holloman v. Holloman, 691 So.2d 897, 898 (Miss.1996).

. Robison v. Lanford, 841 So.2d 1119, 1122 (Miss.2003).

. Yelverton v. Yelverton, 26 So.3d 1053, 1056 (Miss.2010).

. West I, 891 So.2d at 219.

. The Armstrong factors are factors to be considered by chancellors when considering the appropriate award of periodic alimony. Steiner v. Steiner, 788 So.2d 771, 776 (Miss.2001) (citing Tilley v. Tilley, 610 So.2d 348, 353-54 (Miss.1992)); Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss.1993).

. West I, 891 So.2d at 214.

. West I, 891 So.2d at 212 (citing Taylor v. Taylor, 392 So.2d 1145, 1147 (Miss.1981)).

. See Rogillio v. Rogillio, 57 So.3d 1246, 1250 (Miss.2011) (citing Brennan v. Brennan, 638 So.2d 1320, 1324 (Miss.1994)). See also East v. East, 493 So.2d 927, 931 (Miss.1986) ("The parties cannot by contract deprive, and it is doubtful if any court has the authority to deprive itself of the future authority to modify ordinary periodic alimony, or make it continue beyond the remarriage of the wife or the death of the husband.”) (citations omitted).

.West I, 891 So.2d at 219.

. Black’s Law Dictionary 1244 (8th ed.2004).

. Id.

.(Emphasis added.)

. West I, 891 So.2d at 217-18.

. Id.

.Alterman Foods, Inc. v. United States, 505 F.2d 873, 877 n. 7 (5th Cir.1974).

. Miss.Code Ann. § 13-3-129 (Rev.2002).

. Miss. R. Civ. P. 52.

. Miss.Code Ann. § 13-3-129 (Rev.2002).

. Id.

. Microtek Med., Inc. v. 3M Co., 942 So.2d 122, 132 (Miss.2006).

. Upchurch Plumbing, Inc. v. Greenwood Utils. Comm’n, 964 So.2d 1100, 1117 (Miss.2009).

. Lewis v. Lewis, 586 So.2d 740, 742 (Miss.1991) (quoting Rainwater v. Rainwater, 236 Miss. 412, 420-21, 110 So.2d 608, 610-11 (1959)).

. McKee v. McKee, 418 So.2d 764, 767 (Miss.1982).

. See e.g., Tupelo Redevelopment Agency v. Gray Corp., 972 So.2d 495, 521 (Miss.2007) (holding that a trial judge’s award of attorney fees will not be disturbed unless it is manifestly wrong).

. McKee, 418 So.2d at 767.