## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-01512-COA

**PAUL BERLIN AND JANICE BERLIN**                                            **APPELLANTS**

**v.**

**LIVINGSTON PROPERTY OWNERS**                                              **APPELLEE**
**ASSOCIATION, INC., A MISSISSIPPI NON-**
**PROFIT CORPORATION**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/23/2015 |
| TRIAL JUDGE: | HON. CYNTHIA L. BREWER |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | DONALD W. BOYKIN |
| | V. DOUGLAS GUNTER |
| ATTORNEYS FOR APPELLEE: | JAMES L. MARTIN |
| | DAVID GLYN PORTER |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| TRIAL COURT DISPOSITION: | INJUNCTIVE RELIEF GRANTED |
| DISPOSITION: | AFFIRMED - 04/25/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE GRIFFIS, P.J., ISHEE, WILSON AND GREENLEE, JJ.

### WILSON, J., FOR THE COURT:

¶1.     Paul and Janice Berlin are residents of Livingston, a covenant-restricted community

in Madison County.  Their 3.56-acre lakefront lot is subject to a maintenance easement that

extends twenty feet onto their property from the lake's highwater mark.  Their lot is also

subject to a covenant requiring them to obtain approval from the Architectural Review

Committee (ARC) of the Livingston Property Owners Association (LPOA) prior to

beginning construction of fences and other improvements on their property.  The Berlins

asked the ARC to approve a planned fence that would not be enclosed on the lakeside

boundary of their property but would instead extend across the maintenance easement and three feet out into the lake along their east and west property lines. The ARC declined to approve the proposed fence on the ground that it would interfere with the maintenance easement. The Berlins built the fence anyway.

¶2. LPOA sued the Berlins in the Madison County Chancery Court. Following a two-day trial, the chancellor entered a final judgment and opinion finding that the Berlins were in violation of the restrictive covenants applicable to their property. She ordered them to remove the portions of their fence that extend across the easement and into the lake. She also awarded LPOA attorneys' fees. The Berlins appealed. They argue that the chancellor's decision is erroneous for multiple reasons, that she erred in awarding attorneys' fees without holding a hearing on the reasonableness of the fees requested by LPOA, and that she abused her discretion by excluding one document as irrelevant. For the reasons that follow, we find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶3. Livingston is a residential community consisting of fifty-nine lots and four lakes on sixteenth-section school trust land near the intersection of Highway 463 and Highway 22 in Madison County. All lots in Livingston are subject to a declaration of covenants, conditions, and restrictions that was duly filed with the Madison County Chancery Clerk in 2001. The declaration established LPOA, which is responsible for enforcing the covenants and maintaining all common areas and lakes.

¶4. In 2005, the Berlins entered into a long-term residential lease for Lot 21 at Livingston,

2

a 3.56-acre lot on one of the subdivision's lakes. The Berlins' lease states that their lot is subject to the covenants.

¶5. Section 11.02 of Livingston's covenants reserves to LPOA a twenty-foot easement from the lake's edge at its highwater level for lake "maintenance and control purposes only." The declaration clearly states, in multiple places, that any interest in any of the lakefront properties in the subdivision is subject to the easement.

¶6. The covenants also establish the ARC to exercise "architectural control" over the subdivision. Section 10.02 of the covenants provides, as relevant in this case, that "no . . . fences . . . shall be commenced, erected, constructed[,] . . . or permitted to remain on . . . any Lot, until after compliance with the review process of this Article X and approval . . . by the [ARC]." The review process requires the submission of detailed building and landscaping plans to the ARC. Section 10.03 provides that the ARC must review and approve or disapprove submissions within thirty business days of receipt of all plans. Section 10.03 also states that the ARC shall provide "[w]ritten notice of [its] decision," which "shall specify the reasons for any disapproval." Decisions of the ARC may be appealed to the subdivision's board of directors, and residents are entitled to a hearing before the board.

¶7. On or about February 6, 2010, Paul Berlin delivered a handwritten plan for the construction of a fence on his lot to Jerry Ward, the chair of the ARC. The plan proposed the construction of iron fences commencing on both sides of the Berlins' home, running to and then continuing down the property lines on the east and west sides of the property, and then finally crossing the twenty-foot maintenance easement and extending three feet out into

the lake. The plan also showed a three-foot-wide "walk gate" on one side of the maintenance easement and an eight-foot-wide "access gate" on the opposite side of the easement.

¶8. The ARC met within a few days and voted unanimously to disapprove the proposed fence. Ward then met with Paul and explained that the ARC had disapproved the fence because it crossed the maintenance easement and extended into the lake. Ward suggested that Paul could revise and resubmit his plan or meet with the ARC. The ARC would have approved a fence with the same design and materials if it had been enclosed on the lakeside of the property and stopped short of the maintenance easement. Ward told Paul that he could also appeal and meet with LPOA's board of directors. Paul responded that enclosing the fence, rather than extending it into the lake, would cost an additional $5,400. Paul then told Ward that he was not going to meet with the board or the ARC and that he intended to build the fence as proposed, without revisions and without ARC approval.

¶9. Ward notified LPOA's board of directors of Paul's statement that he intended to build the fence without ARC approval, and the board contacted LPOA's attorney, Don McGraw. On February 26, 2010, McGraw sent a letter to the Berlins confirming that the ARC had disapproved their proposed fence. McGraw's letter also stated that he understood that the Berlins had stated that they intended to disregard the ARC's decision and build the fence anyway. McGraw warned that LPOA would seek injunctive relief and an award of attorneys' fees and expenses if the Berlins proceeded in disregard of the ARC's decision.

¶10. The Berlins began construction on their fence at some point in March 2010. Although they never submitted modified plans to the ARC, they ultimately constructed the fence with

4

three eight-foot-wide gates. Otherwise, the fence was constructed as originally planned. On March 31, 2010, their attorney sent McGraw a letter informing him that the Berlins intended to proceed with construction of the fence. The letter asserted that the Berlins were entitled to proceed with construction because LPOA failed to give them a written statement of the reasons that the fence was disapproved.

¶11. LPOA filed suit in the Madison County Chancery Court on May 20, 2010. LPOA's complaint asked the court to enforce the subdivision's covenants, enjoin the Berlins from maintaining their fence without ARC approval, and order the Berlins to remove the portion of the fence that encroached on LPOA's maintenance easement. LPOA also requested an award of attorneys' fees and other costs. The Berlins filed an answer and counterclaim accusing LPOA of arbitrary and selective enforcement of the covenants. The counterclaim demanded attorneys' fees, costs, and punitive damages. The parties engaged in discovery, and the case eventually proceeded to trial in January and September 2014.

¶12. Paul, Ward, and Steve Horn were the only witnesses at trial. Horn is a resident of Livingston and the president of its developer, Livingston Development Corporation. Ward and Horn testified that LPOA and its contractors regularly use the maintenance easements that surround the lakes to spray for weed control and to monitor the lakes for beavers and nutria, among other things. They testified that aquatic weeds, beavers, and nutria can cause serious harm to the lakes, which are one of the neighborhood's essential amenities. Horn testified that a contractor regularly rides along the easements, often on a four-wheeler, looking for any issues that need attention. Ward and Horn testified that weed control is

5

conducted with a Kubota or Polaris utility vehicle equipped with a twenty-five gallon tank and a sprayer. Ward and Horn insisted that it was not practical for LPOA and its contractors to work through fences that cross the easement, even if the fences had gates. They noted that the Berlins have three dogs (two bulldogs and a schnauzer), and LPOA did not want to be responsible for keeping dogs inside a fence. In addition, the plans submitted by the Berlins had only one eight-foot-wide "access gate," which would prevent a utility vehicle or four-wheeler from entering on one side of the property and continuing out the other.

¶13. Horn also testified that a neighbor three houses down from the Berlins requested permission to build a fence that was similar but was enclosed and stopped short of the maintenance easement. The ARC approved the plans, and a photograph of the fence was admitted into evidence at trial.

¶14. Paul claimed that he had not witnessed anyone performing any type of maintenance or monitoring within the easement in years. He did not believe that his gated fence would cause any problems for anyone. He testified that he would be happy to put up his dogs if given a little advance notice. Paul also complained that the ARC had authorized another resident, Darryl Gibbs, to plant shrubs across the maintenance easement on Gibbs's property. Paul felt that the ARC had been inconsistent in its enforcement of the covenants.

¶15. On June 24, 2015, the chancellor entered an opinion and final judgment finding that the Berlins had violated the covenants and that LPOA was entitled to injunctive relief. The chancellor ordered the Berlins, within sixty days of the judgment, to remove the portions of their fences that encroached on the twenty-foot maintenance easement. The chancellor also

awarded LPOA $17,485.58 for attorneys' fees and expenses, said amount to be paid in full by the Berlins within one year. The chancellor denied all relief requested in the Berlins' counterclaim. The Berlins filed a timely motion to reconsider or for a new trial, which was denied, and a timely notice of appeal.

## DISCUSSION

¶16. On appeal, the Berlins make five arguments: (1) that LPOA is not entitled to an injunction because the ARC failed to provide written notice of the reasons for its disapproval of the fence; (2) that the chancellor's decision is contrary to the law and against the overwhelming weight of the evidence; (3) that LPOA is not entitled to an injunction because the ARC never promulgated rules regarding construction or improvements; (4) that the chancellor should not have awarded attorneys' fees without holding an additional hearing; and (5) that the chancellor erred by excluding a letter written by LPOA's attorney in regard to a dispute with another resident. We address each of these contentions below, keeping in mind that "[a]n appellate court employs a limited standard of review in chancery matters." *Gaw v. Seldon*, 85 So. 3d 312, 316 (¶12) (Miss. Ct. App. 2012). "The findings of the chancery court will not be disturbed when supported by substantial evidence unless the court abused its discretion, applied an erroneous legal standard, was manifestly wrong, or committed clear error." *Singh v. Cypress Lake Prop. Owners Ass'n*, 192 So. 3d 373, 376 (¶11) (Miss. Ct. App. 2016).

> **I.     The ARC's failure to provide a written statement of reasons for its decision does not excuse the Berlins' violation of the covenants.**

¶17. The Berlins first argue that "LPOA cannot complain" that the Berlins built their

7

fences without ARC approval because the "ARC did not comply with the covenants." The Berlins rely on section 10.03 of the covenants, which provides, in relevant part, as follows:

> Within 30 business days after receipt of all the Plans, the [ARC] shall review the Plans and shall either approve or disapprove all or any portion of the Plans. Written notice of such decision shall be given to the Developer, Owner or other builder, as the case may be, and such notice shall specify the reasons for any disapproval.

¶18.    LPOA responds that the ARC complied with section 10.03 because it acted on the Berlins' request within thirty business days, and section 10.03 does *not* state that the ARC must provide written notice of the reasons for its decision within that time frame—only that the decision itself must be made. In addition, the Berlins received clear written notice from LPOA's attorney within about fifteen business days, although the letter did not specify reasons for the ARC's decision. Ward and Horn also testified that, in other cases, the ARC or the board had been able to resolve issues through informal discussions with homeowners without preparing a formal written statement of reasons. LPOA also argues that a written notice of reasons would have been a hollow and pointless formality in this case because, within fewer than fifteen business days, Ward had orally communicated the ARC's reasons to Paul, and in response Paul unequivocally stated that he would not resubmit his plans or meet with the ARC or the board. The obvious purpose of the requirement of a statement specifying reasons is to provide a basis for the submission of modified plans or further discussions, and Paul made clear that he had no interest in those options.

¶19.    We conclude that the Berlins' argument is without merit. Nothing in the covenants states that a homeowner may proceed with construction simply because he does not receive

8

a written statement of reasons, and the Berlins cite no other authority for their argument. Their argument sounds like a claim that LPOA has "unclean hands," but "the clean hands doctrine prevents a complaining party from obtaining equitable relief in court" only if the party "is guilty of *willful misconduct* in the transaction at issue." *Scruggs v. Wyatt*, 60 So. 3d 758, 772 (¶34) (Miss. 2011) (emphasis added; emphasis omitted) (quoting *Bailey v. Bailey*, 724 So. 2d 335, 337 (¶6) (Miss. 1998)). LPOA is not guilty of any "willful misconduct." Rather, it substantially complied with section 10.03 by promptly informing the Berlins of the reasons for the ARC's decision. The chancellor did not err by rejecting the Berlins' argument, even if we assume arguendo that LPOA technically failed to comply with the letter of section 10.03.

**II.     The chancellor's ruling was neither contrary to law nor against the overwhelming weight of the evidence.**

¶20.    The Berlins argue that the chancellor erred by ordering them to remove the parts of their fences that extend through the maintenance easement. We address this argument against the backdrop of a "body of law" that has developed concerning neighborhood homeowners associations' authority to enforce restrictive covenants. *Perry v. Bridgetown Cmty. Ass'n Inc.*, 486 So. 2d 1230, 1233 (Miss. 1986). More than thirty years ago, our Supreme Court "note[d] that one of the unique characteristics of a homeowners association is mandatory membership. Upon taking title to a lot the property owner automatically becomes a member of the association and is subject to the obligations of membership and enforcement of the covenants." *Id.* "A second unique characteristic of a homeowners association is the power of the association to control the use and enjoyment of property. The

9

extent of the power is defined in the declaration, but usually encompasses use and size of buildings upon individual lots and regulation of the property commonly enjoyed by all lot owners." *Id.* As in this case, an association may, by covenant, require preapproval of all planned construction and alterations, and it may delegate its power to approve or disapprove such plans to a neighborhood architectural review committee. *See Goode v. Vill. of Woodgreen Homeowners Ass'n,* 662 So. 2d 1064, 1074-75 (Miss. 1995). Such covenants are clearly valid and enforceable under Mississippi law. *See id.* at 1075.

¶21. Our Supreme Court has held that

> the association is not beyond review in administration of these powers. The declaration [of covenants] gives rise to review in law or in equity by any lot owner. Review by the court must be guided by the intent stated in the declaration of purpose and judged by a test of reasonableness. Applying a reasonableness standard to a regulation, this Court will consider not only the rights of the individual owner, but also the rights of the other association members who expect maintenance in keeping with the general plan of development for the subdivision.

*Perry*, 486 So. 2d at 1234 (citation omitted).

¶22. The issue in this appeal arises in the context of restrictive covenants that not only grant LPOA a maintenance easement across the Berlins' property but also require the Berlins to obtain LPOA's approval prior to the construction of any new fence on their property. The issue also arises in the context of the Berlins' decision to build their fences without ARC approval and in willful disregard of the ARC's disapproval, which was a clear violation of the covenants. In this context, it is not this Court's role to decide de novo whether the Berlins' fences are an unreasonable interference with LPOA's easement. Rather, our only role is to determine whether "powers granted [to LPOA and the ARC] through the restrictive

10

covenants . . . were reasonably applied." *Goode*, 662 So. 2d at 1075. That is, the only issue for judicial determination is whether LPOA and the ARC acted unreasonably when they decided that the fences would interfere with use of the easement. In applying this standard, we must "consider not only the rights of the individual owner, but also the rights of the other association members who expect maintenance in keeping with the general plan of development for the subdivision." *Id.* (quoting *Perry*, 486 So. 2d at 1234).

¶23. The covenants expressly state that the ARC may disapprove plans for a proposed fence or other improvement to any lot for, inter alia, "any . . . reason or reasons which are not arbitrary or capricious, including, but not limited to, aesthetic considerations." Again, such a restriction is valid and enforceable under Mississippi law. *Goode*, 662 So. 2d at 1075. Moreover, we cannot say that LPOA has enforced the covenant or exercised its authority in an unreasonable manner. Horn and Ward testified that contractors and others regularly require access to maintenance easements in order to monitor the lake for pests and aquatic weeds that can cause serious harm to Livingston's lakes, which are one of the subdivision's essential features. The chancellor found their testimony credible, and the chancellor's findings are supported by substantial evidence and are not clearly erroneous.

¶24. The Berlins counter that any person who needs to access the easement can easily open and shut their gates and drive four-wheelers or other utility vehicles in and out. Paul also testified that he would put up his dogs while any maintenance personnel are present. However, if all lakefront property owners constructed similar fences, persons performing maintenance on the lake would have to contact each homeowner in advance to request that

11

any animals be put up and would have to open and shut gates throughout the neighborhood, rather than riding along the lakeshore uninterrupted. We cannot say that LPOA and the ARC acted unreasonably in concluding that these and other potential issues would interfere with necessary access to the maintenance easement.

¶25.    In arguing that the chancellor's ruling is contrary to law and against the overwhelming weight of the evidence, the Berlins primarily rely on this Court's opinion in *Gaw v. Seldon*, 85 So. 3d 312 (Miss. Ct. App. 2012). In that case, Gaw owned a forty-foot easement across Seldon's property. *Id.* at 314 (¶1). Seldon built brick columns at the entry to his property that encroached on Gaw's easement by nine and a half feet. *Id.* at 314, 316 (¶¶1, 9). Gaw filed a complaint seeking removal of the columns, but the chancellor found that the columns did not interfere with Gaw's reasonable use of the easement for ingress and egress, which was "the express purpose of the easement." *Id.* at 316-17 (¶¶9, 15). Gaw claimed that he planned to build a barn and house on his property in the future, and he asserted that "the columns might prevent large pieces of construction equipment from traveling along his easement[.]" *Id.* at 317 (¶15). But he admitted that he had not begun any construction. *Id.* The chancellor reasoned that the columns could remain until Gaw showed actual interference with his reasonable use of the easement. *Id.* On appeal, this Court affirmed the chancellor's decision in relevant part. *Id.*[1]

---

[1] In general, the owner of the servient estate may build a fence on an easement if (1) the fence is expressly permitted by or consistent with the intent of the easement grant or (2) "intent is undeterminable, but . . . the fence . . . does not unreasonably interfere with" use of the easement by the owner of the dominant estate. *Calvert v. Griggs*, 992 So. 2d 627, 632 (¶14) (Miss. 2008) (citing *Rowell v. Turnage*, 618 So. 2d 81, 87 (Miss. 1993)).

¶26.   *Gaw* is distinguishable in several material respects.  First, *Gaw* did not involve a homeowners association or restrictive covenants.  Second, the easement owner in *Gaw* had not reserved unto himself broad authority to approve or disapprove any new construction on the easement.  In this case, as discussed above, LPOA did exactly that.  Third, the columns at issue in *Gaw* extended less than ten feet onto a forty-foot easement, whereas the Berlins' fences extend across the entire twenty-foot easement at issue here.  The Berlins rely on *Gaw* primarily for its conclusion that the columns could remain until such time as the easement owner could show actual interference with his use of the easement, as opposed to mere potential interference.  However, the chancellor in this case reached a different factual conclusion based on the evidence presented.  As the chancellor discussed, LPOA's witnesses testified that the Berlins' fences interfere with their *current* use of the easement, even if the fences do not prevent access.  The chancellor's findings and credibility determinations on this issue are not clearly erroneous.  Thus, *Gaw* is distinguishable for several reasons, the most significant being that it did not involve judicial review of a homeowners association's exercise of its lawful authority to approve or disapprove new construction.

¶27.   In concluding our discussion of this issue, we emphasize that, in exercising its lawful authority to review and approve construction plans, LPOA never attempted to prevent the Berlins from having a fence on their property.  LPOA simply required that the fence on the 3.56-acre lakefront property stop just short of LPOA's maintenance easement rather than extending across the easement and out into the subdivision's common lake.  A neighbor three doors down from the Berlins built just such a fence with the ARC's approval and without

13

incident. In reviewing the reasonableness of LPOA's decision, "this Court will consider not only the rights of the individual owner, but also the rights of the other association members who expect maintenance in keeping with the general plan of development for the subdivision." *Perry*, 486 So. 2d at 1234. We cannot say that the requirement placed on the Berlins' fences was an unreasonable one. By moving into a covenant-restricted community, the Berlins agreed to abide by the neighborhood covenants and the reasonable regulation of the homeowners association. That is the nature of the deal. The chancery court's judgment enforcing the covenant at issue here was neither contrary to law nor against the overwhelming weight of the evidence.

### III. LPOA's other alleged noncompliance with the covenants does not excuse the Berlins' violations.

¶28. The Berlins next make a cursory argument that LPOA is estopped from enforcing the covenants because LPOA did not "provide evidence" at trial that it had adopted construction rules and regulations, as it is permitted to do by the declaration of covenants. Section 4.02(d) of the covenants provides that LPOA's board has the power, authority, and duty "[t]o adopt, promulgate and enforce such rules, regulations, restrictions and requirements as *may* be recommended by the [ARC] . . . , or as the [b]oard *may* consider to be appropriate" (emphasis added). Section 10.06 likewise provides that the board "*may* adopt and promulgate such rules and regulations" or publish policies or standards "as *may* be considered necessary" (emphasis added). Nothing in the declaration *requires* the board to do adopt such rules. Moreover, nothing in the declaration makes the covenants unenforceable if the board does

14

not issue such rules or regulations. The Berlins' argument is without merit.[2]

### IV. The chancellor was not required to hold a hearing on the reasonableness of LPOA's attorneys' fees.

¶29.  The Berlins argue that the chancellor erred in awarding attorneys' fees to LPOA without conducting a hearing on the reasonableness of the amount awarded. This issue requires discussion of some additional procedural background.

¶30.  At the conclusion of LPOA's case-in-chief in September 2014, LPOA's attorney in the litigation, James L. Martin, requested permission to wait until after the conclusion of the trial to submit an affidavit regarding LPOA's attorneys' fees and costs. The chancellor granted his request, and Martin then asked whether LPOA would "be permitted to have a hearing as to the reasonableness of those fees." The chancellor responded, "Yes, of course. Always." The next day, at the conclusion of the trial, the chancellor gave the parties oral instructions regarding post-trial briefing and submissions, which included the following: "[T]he parties each ask that their attorneys be allowed to present testimony of fees . . . at a later date. This Court hereby requires the same to be done in writing. The affidavit . . . as to the reasonableness and necessity of said services can be attached thereto." In her final instructions to the parties, the chancellor did not mention a hearing on attorneys' fees; rather, she indicated that she would issue her opinion after receiving the parties' submissions.

¶31.  On November 14, 2014, Martin filed an affidavit in support of LPOA's request for

---

[2] The argument is also procedurally barred because the Berlins failed to raise the issue in the chancery court. *See, e.g.*, *City of Hattiesburg v. Precision Constr. LLC*, 192 So. 3d 1089, 1093 (¶18) (Miss. Ct. App. 2016) (applying the "long-established rule" that issues not raised in the trial court will not be considered on appeal).

attorneys' fees and costs of $17,485.58. Martin stated that he had over thirty years of experience as a practicing attorney, including significant experience in real property matters, and that his usual hourly rate was $300. Martin's affidavit also addressed the other factors set out in Rule 1.5 of the Mississippi Rules of Professional Conduct.[3] Martin attached an itemization and hourly breakdown of his work on the case, which showed a total of 59.75 hours billed from 2010 to 2014. On November 17, 2014, one of the Berlins' attorneys filed a similar affidavit in support of their request for $31,637.50 in attorneys' fees and costs, along with itemized billing records. The Berlins' request for attorneys' fees was based on approximately 125 hours of attorney time at a rate of $250 per hour.

¶32. On June 24, 2015, the chancellor issued her opinion and final judgment and found that LPOA was entitled to recover $17,485.58 in attorneys' fees and costs pursuant to section 14.01 of the covenants. In their motion for reconsideration or a new trial, the Berlins objected that they had not been "afforded an opportunity to contest . . . whether [LPOA's attorneys' fees] were reasonable and necessary." LPOA responded that the chancellor's post-trial instructions put the Berlins on notice that the court intended to rule on the issue without a further hearing. LPOA also argued that its attorney's affidavit was sufficient and that no hearing was necessary. On September 3, 2015, the chancellor denied the Berlins' motion without specifically addressing the issue of attorneys' fees.

¶33. The Berlins do not dispute that a prevailing party in an action to enforce the covenants

---

[3] *See Tupelo Redev. Agency v. Gray Corp.*, 972 So. 2d 495, 521 (¶79) (Miss. 2007) ("Rule 1.5 . . . sets out several factors which the trial court should consider in determining the reasonableness of the amount of attorneys' fees."). The Rule 1.5 factors are similar to the factors discussed in *McKee v. McKee*, 418 So. 3d 764, 767 (Miss. 1982).

is entitled to an award of attorneys' fees, and section 14.01 makes clear that a prevailing party is entitled to such an award. *See Journeay v. Berry*, 953 So. 2d 1145, 1162-63 (¶¶63-66) (Miss. Ct. App. 2007) (holding that valid restrictive covenants are contractual in nature and therefore may support an award of attorneys' fees). However, "[a] contractual provision to pay attorney's fees is not a blank check; it is limited by the reasonableness of the fee which includes an analysis of whether work performed was actually necessary." *Pikco Fin. Inc. v. Staten* (*In re Staten*), 559 B.R. 666, 674 (Bankr. S.D. Miss. 2016). "[W]e review the issue of the reasonableness of the trial court's award of attorneys fees applying an abuse of discretion standard. This Court will not disturb the finding of the trial court on such an issue unless it is manifestly wrong or exhibits a manifest abuse of discretion." *Microtek Med. Inc. v. 3M Co.*, 942 So. 2d 122, 130 (¶24) (Miss. 2006), *abrogated on other grounds by Upchurch Plumbing Inc. v. Greenwood Utils. Comm'n*, 964 So. 2d 1100, 1116-17 (¶¶41-43) (Miss. 2007). "In this context, the word 'manifest' has been defined to mean 'unmistakable, clear, plain, or indisputable.'" *Id.* (quoting *Mosley v. Mosley*, 784 So. 2d 901, 904 (¶7) (Miss. 1997)).

¶34.    No rule requires a chancellor to hold a hearing prior to making a determination as to the reasonableness of requested attorneys' fees. In addition, Mississippi Code Annotated section 9-1-41 (Rev. 2014) provides:

> In any action in which a court is authorized to award reasonable attorneys' fees, the court shall not require the party seeking such fees to put on proof as to the reasonableness of the amount sought, but shall make the award based on the information already before it and the court's own opinion based on experience and observation; provided however, a party may, in its discretion, place before the court other evidence as to the reasonableness of the amount

17

of the award, and the court may consider such evidence in making the award.[4]

Finally, although a chancellor generally should provide some on-the-record analysis of the factors set out in Rule 1.5 of the Rules of Professional Conduct, the failure to do so is not per se reversible error, and the chancellor's award may be upheld so long as the amount is "not unreasonable." *West v. West*, 88 So. 3d 735, 747 (¶58) (Miss. 2012); *see Jordan v. Jordan*, 105 So. 3d 1130, 1135-36 (¶¶24-28) (Miss. Ct. App. 2012) (Fair, J., specially concurring).

¶35.    Given the history of this litigation, the amount of fees awarded by the chancellor was "not unreasonable," and we cannot say that she abused her discretion. The case was pending for five years and involved multiple depositions, a two-day trial, a motion to reopen the case, and other post-trial briefing and motions. Nonetheless, LPOA requested and was awarded attorneys' fees for less than 60 hours of attorney time. We also note that the Berlins claimed that they were entitled to a considerably larger award of attorneys' fees and costs ($31,637.50 as compared to $17,485.58) and claimed that their lawyers reasonably spent more that twice as many hours working on the case (about 125 hours as compared to about 60 hours). If the Berlins' fee request was even in the ballpark of "reasonable," then the chancellor's award to LPOA cannot be unreasonable. Finally, we note that although LPOA's attorney filed his detailed time records with his affidavit in November 2014, the Berlins have never identified any duplicative or unnecessary time entries or articulated *any* way in which LPOA's requested fees are unreasonable. Given the particular facts and history of this case, the

---

[4] Section 9-1-41 applies "[i]n any action" in which an award of reasonable attorneys' fees is authorized and thus applies regardless of whether the award is based on a statute, a contractual provision, or common law. *See Staten*, 559 B.R. at 670 n.4.

amount of fees awarded was not unreasonable, and we cannot say that the chancellor abused her discretion by awarding fees without a hearing or additional findings of fact. *See West*, 88 So. 3d at 747 (¶58). Accordingly, the award of attorneys' fees is affirmed.

### V. The chancellor did not abuse her discretion by refusing to admit a letter that LPOA's attorney wrote regarding another case.

¶36. Horn testified on cross-examination that in 2007 another Livingston resident, Greg Giurintano, built a fence across the maintenance easement on his property. Horn objected to the fence and asked Giurintano to move it, but Giurintano refused. Horn testified that in the early years of the development before many lots were sold, he essentially acted as the ARC, and he was unsure whether the ARC was functioning when the Giurintano dispute began. Horn also testified that he and Giurintano were once friends but had a falling out over the fence dispute. The Berlins' attorney then asked, "[I]sn't it true that y'all settled that issue back in 2007?" Horn denied that the dispute had been settled and testified that it was still the subject of a separate lawsuit, also pending in the Madison County Chancery Court.[5]

¶37. The Berlins then attempted to introduce a letter dated November 13, 2007, from Don McGraw to the Giurintanos' attorney that stated in part as follows:

> [LPOA] inquired as to the status of the fencing issue and I told them that you and I had spoken in the last two or three weeks but had not finalized anything. To reiterate:

---

[5] In the chancery court, the Berlins filed a motion to consolidate their case with a case captioned *LPOA v. Anna Marie Giurintano*. The *Giurintano* case arose from a complaint for injunctive relief filed by LPOA, which alleged that the Giurintanos violated the covenants by constructing a fence without submitting plans to the ARC for approval. The Giurintanos were represented by the same attorneys as the Berlins and joined in the motion to consolidate. However, the chancery court denied the motion, and the record in this appeal does not include additional information about the *Giurintano* case.

19

1.     The fencing as it travels to the water's edge will be allowed as long the entry gate into the Giurintano's [sic] yard is at least 10 feet wide.

. . . .

3.     The fencing on the west side of the lot needs to be moved to the lot line so that it will not interfere with the lake access easement as provide for on the plat.

. . . .

Livingston would like to have resolutions to these matters within ten (10) days.

I look forward to hearing from you.

Horn then testified that McGraw was not authorized to permit the Giurintanos' fence to extend across the maintenance easement.

¶38.   LPOA objected to the letter being introduced into evidence and to further questions about it, arguing that the dispute with the Giurintanos was irrelevant to the issues in the Berlins' case. The chancellor sustained LPOA's objections. On appeal, the Berlins argue that the chancellor abused her discretion by excluding the letter because it was evidence that LPOA had acted arbitrarily and capriciously in disapproving their fence plans.

¶39.   "Whether evidence is relevant and/or admissible is left to the discretion of the chancellor, and reversal occurs only where that discretion has been abused." *Prestridge v. City of Petal*, 841 So. 2d 1048, 1059 (¶53) (Miss. 2003). "Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the case." M.R.E. 401. "Irrelevant evidence is not admissible." M.R.E. 402.

20

¶40.    We cannot say that the chancellor abused her discretion by excluding the letter. In the letter itself, McGraw stated that he had told LPOA that he "had not finalized anything" "as to the status of the fencing issue"; Horn denied that McGraw had authority to allow the Giurintanos' fence to cross the maintenance easement; and it appears that nothing was ever settled or finalized, since the issue with the Giurintanos' fence remained in litigation years later. Under the circumstances, the chancellor did not abuse her discretion in finding that the letter was irrelevant. Furthermore, there is nothing to indicate that exclusion of the letter had any impact on the chancellor's ultimate findings and conclusions.

**CONCLUSION**

¶41.    The chancellor's judgment and findings are supported by substantial evidence and are neither contrary to law nor clearly erroneous. We reject the Berlins' arguments that LPOA's alleged noncompliance with the covenants excuses the Berlins' own clear violations of the covenants. Finally, the chancellor's award of attorneys' fees was reasonable, and she did not abuse her discretion by awarding such fees without a hearing or by excluding a letter related to LPOA's dispute with another resident.

¶42.    **THE JUDGMENT OF THE CHANCERY COURT OF MADISON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, FAIR, GREENLEE AND WESTBROOKS, JJ., CONCUR.**